IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ZACKERY C. TYNDALL,

    *Plaintiff*,

    v.

THE BERLIN FIRE COMPANY, *et al.*,

    *Defendants*.

Civil Action No. ELH-13-02496

**MEMORANDUM OPINION**

This case concerns allegations of employment discrimination brought by Zackery C. Tyndall, a firefighter and paramedic, against the Berlin Fire Company ("BFC"), and allegations of intentional infliction of emotional distress against Bryon Trimble and Derrick Simpson, two of Tyndall's former co-workers at BFC.[1]  *See* ECF 53 ("Third Amended Complaint").

Tyndall was a paid employee of BFC from 2008 to 2013.  He alleges that BFC violated Title VII of the Civil Rights Act of 1964, codified, as amended, at 42 U.S.C. §§ 2000e *et seq.*, when BFC supervisors enabled the creation of a hostile work environment (Count I); retaliated against him for reporting harassing behavior (Count III); and ultimately fired him in retaliation for his reporting activity (Count III).  *See* ECF 53 at 11-12, 15-16.  Further, Tyndall alleges that Trimble and Simpson intentionally inflicted emotional distress on him when they engaged in much of the conduct that forms the basis for Tyndall's Title VII claim.  The alleged conduct included, *inter alia*, calling Tyndall "gay boy" or "homo"; criticizing as "gay" his behavior with

_____

[1]  Simpson's first name is spelled "Derek" in the Third Amended Complaint and on the docket.  ECF 53.  However, at Simpson's deposition, he spelled his first name as "D-e-r-r-i-c-k".  *See* Ex. 4 to Defendants' Motion to Dismiss (ECF 54).  Exhibit 4 was filed in paper copy only.

women, his hair, clothes, car, diet, home décor, and his relationship with his mother; touching

him inappropriately; threatening his job; and turning his colleagues against him, so that some

refused to assist him while he was serving as an emergency responder at a motor vehicle accident

(Count II). Tyndall maintains that he is heterosexual, and Trimble and Simpson claim that they

believe him. *See, e.g.*, ECF 54-5 at 7, 8; ECF 55 at 23.

Now pending is "Defendants' Motion For Partial Summary Judgment", as to Counts I

and II of the Third Amended Complaint. ECF 54 ("Motion"). The Motion is supported by a

memorandum of law (ECF 54-5, "Memo"), as well as twelve exhibits. *See* ECF 54-7 through

ECF 54-18, and Ex. 4.[2]  Both sides rely primarily on the deposition testimony of six men:

Tyndall; Trimble; Simpson; David A. Fitzgerald; Norris P. Donohoe; and, to a lesser extent,

Marcus N. Brown.

BFC advances multiple, alternative arguments. First, BFC argues that this Court "lacks

subject matter jurisdiction" as to Count I because BFC has always employed fewer than fifteen

persons, and therefore Title VII is not applicable. ECF 54-5 at 26. Second, BFC claims that

certain alleged acts are time-barred. *Id*. at 27-28. Third, BFC contends that there "is no claim

for sexual orientation discrimination under Title VII." *Id*. at 30. Fourth, defendants assert that

the alleged discriminatory conduct was not based on Tyndall's "sex." *Id*. at 30-39. Fifth, and

finally, BFC claims the conduct was not so severe or pervasive as to create a hostile work

environment. *Id*. at 39-42. With respect to Count II, Trimble and Simpson argue that some of

---

[2] Defendants filed identical copies of Exhibit 3, an excerpt from the deposition of Bryon J. Trimble, at ECF 54-9 and ECF 54-10. I assume that this was in error, and that Exhibit 4, an excerpt from the deposition of Derrick E. Simpson, should have been filed at ECF 54-10 instead. In their Memo, defendants frequently rely on Exhibit 4. *E.g.*, ECF 54-5 at 8. The Court received this exhibit in paper form, as part of the courtesy copy of the Motion.

the acts alleged are time-barred, *id*. at 42, and "Tyndall's remaining allegations are not sufficient to support a claim for IIED under Maryland law." *Id*. at 43-45.

Plaintiff opposes the Motion (ECF 55, "Opposition"), and has submitted twenty-four exhibits. *See* ECF 55-6 through ECF 55-29. Plaintiff also submitted a short "Supplemental" to his Opposition (ECF 57), consisting of an affidavit supplementing and authenticating two exhibits filed with his Opposition. Defendant submitted a reply (ECF 58, "Reply"), with five additional exhibits. *See* ECF 58-1 through ECF 58-5.

The Motion has been fully briefed, and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I will DENY the Motion as to both Counts.

## I.  Factual Background

### A.  Berlin Fire Company, the Individual Defendants, and Others

BFC "provides fire, rescue, and emergency medical services [("EMS")] to northern Worcester County [, Maryland] … including all of the corporate limits of the Town of Berlin [the "Town" or "Berlin")]… ." Affidavit of David A. Fitzgerald, Ex. 1 to Motion, ECF 54-7 ("Fitzgerald Aff.") ¶ 4. BFC "began providing emergency medical/ambulances services in the mid-1960s," and "hired its first employee" in the 1970s, "to help staff the ambulances." *Id*. "Presently, the [BFC] employs six (6) full-time paramedics (EMT-P) who perform advanced life support ("ALS") services and four (4) full-time emergency medical technicians ("EMT-B" or "EMT") who perform basic life-support ("BLS") services." *Id*. The paid EMTs are also "cross-trained in firefighting." *Id*. "During the time alleged in the Third Amended Complaint, the Company also had one paid, part-time administrative position." *Id*. "All full-time EMS are male; there are two or three part-time female EMS personnel." *Id.* ¶ 6.

In addition to BFC's paid staff of about eleven, BFC manages a larger cadre of volunteers. The volunteers are regarded as "members" of BFC, and a variety of membership statuses are available. See, *e.g.*, Supplemental Affidavit of David A. Fitzgerald, ECF 58-5 ("Fitzgerald Supp. Aff.") (referring repeatedly to "volunteer members"); ECF 54-7 at 7 (letter from BFC addressed to "All Members (Active, Gold Badge, Life, Retired, Cadet, Auxiliary, and Paid Employees[ )]").[3] The parties agree that the BFC had "approximately 60 volunteers" during the period of Tyndall's employment. *See* Deposition of Bryon J. Trimble, Ex. 3 to Motion, ECF 54-9 ("Trimble Depo. Pt. One") at 61:15-19; Opposition, ECF 55 at 18. The parties do not specify whether those figures include all membership levels, or only active volunteer firefighters. *Id*. BFC's volunteers are not paid wages, but they do receive certain benefits in exchange for their membership and service. The parties dispute what benefits are available to BFC volunteers, either directly from BFC or as a result of a member's participation with BFC as a volunteer, and whether those benefits amount to "significant remuneration" within the meaning of Title VII. The facts at issue in this dispute are recounted, *infra*, in relation to the question of whether BFC had at least fifteen "employees" within the meaning of Title VII during Tyndall's employment at the BFC.

---

[3] For example, Tyndall "began volunteering with [BFC] at age 14," as "a junior cadet." Deposition of Zackery Tyndall, Ex. 6 to Motion, ECF 54-12 at 39:2-8. In 2008, after Tyndall turned eighteen and graduated from high school, he attained the "membership status" of volunteer firefighter. *Id*. at 40:9-21. Tyndall's father, in contrast, is a "gold badge member." *Id*. at 47:7-10. According to Tyndall, BFC members may become gold badge members after 25 years of volunteer service, at which point the member may remain a member without responding to service calls, but "get[s] to keep a key" and perhaps to keep "turn-out gear." *Id*. at 47:17-22, 48:1-6. Tyndall's mother was a "ladies auxiliary" member, a status which she obtained by marrying Tyndall's father. *Id*. at 45:5-22.

BFC's command structure is composed of volunteers.  *See*, *e.g.*, Trimble Depo. Pt. One, ECF 54-9 at 52:16-17.  Although the structure is not entirely clear from the record, it appears that a volunteer Board of Directors, led by a Board Chairperson, *see* ECF 54-7 at 5 (letter from BFC to employees), is generally at the head of BFC.  The Board of Directors also includes a President.  Deposition of David Fitzgerald, Ex. 2 to Memo, ECF 54-8 ("Fitzgerald Depo. Pt. One") at 92:14-17.   A supervisory group of volunteer officers, which reports to the Board, manages BFC day-to-day.  *See id.* at 55:13-21.  The supervisory group includes a Fire Chief ("Chief") and some number of Assistant Chiefs, *see*, *e.g.*, Trimble Depo. Pt. One, ECF 54-9at 104:3-21, with titles such as First, Second, and Third Assistant Fire Chief.  *See*, *e.g.*, *Id.* at 48:15-20.

In 2008, BFC also created a paid supervisory position for an "EMS Supervisor." Deposition of Norris P. Donohoe, Jr., Ex. 5 to Motion, ECF 54-11 ("Donohoe Depo. Pt. One") at 19:13-21, 20:1-4.  The EMS Supervisor serves as the direct supervisor for paid EMS personnel, *see* Trimble Depo. Pt. One, ECF 54-9 at 56:1-9, and is responsible for scheduling shifts for EMS personnel, as well as for paperwork, small equipment repairs, and filling in on emergency services, as needed.  Donohoe Depo. Pt. Pt. One, ECF 54-11 at 20:12-21.  In addition, a group known as the "Hiring Board" or "Hiring Committee" is responsible for hiring and firing decisions.  Deposition of Zackery Tyndall, Ex. 6 to Motion, ECF 54-12 ("Tyndall Depo. Pt. One") at 100:8-16, 122:19-22; *see also*, *e.g.*, Donohoe Depo. Pt. Pt. One, ECF 54-11 at 24:8-10.

From at least January 2009 through August 2012, paid BFC personnel were also under the supervision and control of the Town of Berlin ("Town" or "Berlin").  "From 1974 to 2009, the Town of Berlin administered the salaries and benefits for [BFC's] paid EMS personnel but

the funding was provided by the Company." Fitzgerald Aff., ECF 54-7 ¶ 7.  In January 2009, the BFC and Berlin "entered into a 'Memorandum of Agreement,' formally establishing a relationship for the purpose of classifying the paid EMS personnel as 'leased employees' to the Town, thereby allowing the leased employees to participate in the State of Maryland pension fund." *Id*.  As discussed below, the BFC and Berlin ended this agreement in August 2012. *Id*. ¶ 8.  Ultimate responsibility for control of BFC's paid employees was apparently at the heart of the disagreement between BFC and Berlin that led to the end of their "Memorandum of Agreement".

Defendant Trimble has been a volunteer member of BFC since 1988, when he was eighteen years old.  Trimble Depo. Pt. One, ECF 54-12 at 47:1-10.  He has held a number of elected leadership positions with BFC throughout the years, including serving three times as Chief.  *Id*. at 48:1-21, 49:3-17.  It appears that in 2008, when Tyndall began working as a paid employee of BFC, Trimble was serving as an Assistant Chief at some level or took on that role soon after.  *See* Tyndall Depo. Pt. One, ECF 54-12 at 104:1-21.  In December 2011, Trimble was elected Chief for the 2012 term.  Trimble Depo. Pt. One, ECF 54-12 at 49:18-21, 50:1-4.  He resigned as Chief in the Summer of 2012.  *Id.* at 51:2-5.

Defendant Simpson first joined BFC as a cadet member in 1995 and became a volunteer firefighter in 2000.  Deposition of Derrick E. Simpson, Ex. 4 to ECF 54 (paper copy only) ("Simpson Depo. Pt. One") at 26:2-10.  In 2009 and 2010, Simpson served as Chief of BFC.  *Id*. 27:3.  In 2011, he served as Second Assistant Chief.  *Id*. 26:3-4.  In 2012, he was First Assistant Chief.  *Id*. at 26:4-5.

David A. Fitzgerald began working at BFC in 1991, and worked there as a full-time employee until 2003. Fitzgerald Depo. Pt. One, ECF 54-8 at 15:4-7. He has been the President of BFC since 2010. *Id*. at 91:19-21, 92:1-10.

In 1998, Norris P. Donohoe began working with BFC as a paid firefighter and Cardiac Rescue Technician ("CRT"). Donohoe Depo. Pt. One, ECF 54-11 at 19:7-12. According to Donohoe, he was promoted to the new position of EMS Supervisor in Fall 2008. *Id*. at 19:19-21, 20:1-4. Donohoe continued to serve as EMS Supervisor until May 2012, when he was fired by Berlin. *Id*. at 21:3-7. He was rehired by BFC in August 2013 as an EMS provider. *Id*. at 24:8-12.

Marcus N. Brown has been a member of BFC since at least 2008. Deposition of Marcus N. Brown, Ex. 9 to Motion, ECF 55-10 ("Brown Depo. Pt. One") at 34:8-12. He became the Chief after Trimble's resignation in 2012, and served in that position from September 2012 through December 2013. *Id*. at 35:3-18.

### B. Tyndall's Allegations

Defendants do not expressly dispute most of Tyndall's allegations concerning his co-workers' conduct. Instead, they provide a bullet-point list of his allegations, ECF 54-5 at 33- 37, and characterize them as "teasing and horseplay." *Id*. at 33. In their Reply, they also outline a few specific disputes with "Tyndall's Factual Background Allegations," as presented in his Opposition. ECF 58 at 1-4. These disputes all appear to relate to Count III, which is not at issue in the Motion. *Id*.

As noted, Tyndall began to volunteer with BFC in approximately 2004, at the age of fourteen, as a junior cadet.  Tyndall Depo. Pt. One, ECF 54-12 at 39:2-4.[4]  Further, because of the long affiliation of Tyndall's father with BFC, Tyndall recalls spending time there as a child, and thought it was "a very kind place."  *Id.* at 69:14-21.  Until 2007, nothing happened at the firehouse or with BFC members that Tyndall perceived as inappropriate or that made him uncomfortable.  Deposition of Zackery Tyndall, Ex. A to Opposition,  ECF 55-6 ("Tyndall Depo. Pt. Two") at 61:21-22, 62:1-2.   At his deposition, Tyndall recounted the beginning of his harassment, as follows, *id* at 61:3-12:

> Q  [W]hat started happening in 2007 with you and members of the [BFC]?
>
> A  In 2007, there was a – that's my junior year and senior year of high school. They started calling me gay after a dance that we had.  There was a woman that offered to have sex with me after the prom, and she was intoxicated, and I did not have sex with her.  And they had the assumption that I was gay because I did not have sex with her.

Upon further questioning, Tyndall clarified that by "they" he meant Trimble and Simpson.  *Id.* at 62:21-22, 63:1-2.  Tyndall stated that he thought Trimble and Simpson learned of the dance incident through some of Tyndall's "group" in the cadet program.  *Id.* 63:3-12.

Trimble agreed at his deposition that he had referred to Tyndall as "gay boy," "homo," and "queer", but in "a joking manner," and he agreed that he had been doing so since Tyndall was a cadet.  Trimble Depo. Pt. One, ECF 54-9at 114:10-21, 115:1.  Trimble stated that "Gay Boy" was "just a nickname," which Trimble called Tyndall "throughout his career in the Fire Company."  Deposition of Bryon J. Trimble, Ex. C to Opposition, ECF 55-8 ("Trimble Depo. Pt.

---

[4] Tyndall explained, ECF 54-12 at 39:11-14:  "As a cadet, you basically supplemented the firemen on the scene of an emergency, … get them a tool, help them stretch a line, sweep up some debris on the roadway."

Two") at 69:1-21, 70:1-14.  According to Trimble, everyone joked about it.  *Id*. at 70:13-14.  He did not know where the nickname came from.  *Id*. at 70:18-20.  Trimble also said that, an unspecified number of times, he "answered [his] phone when Zack would call … on occasion as Homo Anonymous."  *Id*. at 84:405.

Simpson also agreed that he has called Tyndall "gay boy" or "homo," and stated that he thought he started doing so after hearing about the incident at the dance.  Simpson Depo. Pt. One, at 69:21, 70, 1-16.  Simpson described the early name-calling as follows, *id*.:

Q  Why did you call Zack gay boy or homo?

A  It's just something that was done … .  It started after, I think, he kind of told on himself, actually, that a girl … called him that, and it just kind of stuck.  He called himself that and other people called him that and it didn't seem to bother him, he went along with it as everybody else.

*\*\*\**

Q  This is the girl that was intoxicated and wanted to have sex with Zack at the prom, is that right?

A  Yes.  I don't know where it took place, but that's the girl.

Tyndall stated that initially he "kind of brushed it [*i.e.*, the name-calling] off."  Tyndall Depo. Pt. One, ECF 54-12 at 65:4-11.  He explained:  "I didn't really think much of it, I just figured that they may have had – they thought that I should have had sex with her, and I felt that it was the right thing to do not to have sex with her.  And it wasn't – it wasn't an everyday thing. So it wasn't like I said stop; I was like, 'I'm not gay,' … ."  *Id*. at 65:12-17.

Tyndall reports that sometime later in 2007 or in 2008, apparently after the name-calling began, Trimble touched him in his groin area in a way that made him feel uncomfortable.  ECF

54-12 at 71:21-22, 72:1-20.   Tyndall described the incident as follows, *id* (ellipses in brackets added):

> Q  From 2007 to 2008, was there any inappropriate touching or contact, or contact that made you feel uncomfortable?
>
> A  Yes, ma'am.
>
> Q  All right, and tell me about that.
>
> A  There was a time that I was beside the ambulance, I was in the – the way the firehouse is set up, the south side of the building, there is a ladder truck and a couple of ambulances.  […]  How it came up exactly, I don't recall, but Bryon Trimble started tickling my side and then he like touched my groin.  And then we both looked up and Jeff Dean, who was a paramedic with the [BFC] at the time, was standing in the office doorway just looking.  I felt uncomfortable about the situation, and I don't know how he felt about the situation but …
>
> Q  All right.  Did you ever have a conversation with [Trimble] about what happened?
>
> A  No.  I was kind of like shocked at first, it was weird for me.  I never had a man touch me in an area like that, in my groin.  And it was kind of like I was stunned, like I didn't know what—at first, like what the heck just happened.

Tyndall also said that sometime in 2007 or 2008, both Trimble and Simpson frequently initiated a "game" that the parties refer to as "Bangkok."  *E.g*., ECF 55 at 2.  In short, Trimble or Simpson would ask Tyndall "What is the capital of Thailand?," and then they would hit Tyndall in the groin.  Tyndall Depo. Pt. Two, ECF 55-6 at 75:11-19.  Tyndall claims this happened every few days for some unspecified period of time, and then in 2007 or 2008 the game "just died off." *Id*. at 77:1-7.   According to Tyndall, he routinely told Trimble and Simpson not to hit him in the groin.  *Id*. at 77:13-19.  Other "members of the fire company" also engaged in the game.  Tyndall Depo. Pt. One, ECF 54-12 at 233:19-20.  Tyndall said that, "for a little while, it was happening in the culture" of BFC.  *Id*. at 234:5-10.  But Tyndall remembers feeling that soon "it progressed

to just [Trimble and Simpson] doing it" to Tyndall, which Tyndall describes as "weird." *Id*. at 234:1-18.

During the same time frame, 2007-2008, Tyndall and Trimble would sometimes walk or run around town together for exercise. Tyndall Depo. Pt. Two, ECF 55-6 at 79:3-12. Tyndall was "a little heavier set in high school" and he was working to lose weight at the time. *Id*. He claims that "there were other members of the fire company that took part [in the exercise routines] as well, Bryon Trimble being one of them." *Id*. But "[m]ostly" it was just the two of them. *Id*. at 79:22, 80:1-3. During their exercises, when the men would pass the house of a girl who Tyndall had "a bit of a crush on in high school," Trimble "would comment on the fact that she was probably having sex with someone else, and that he knew I was gay, I should just go ahead and say it, it's okay, I can tell him that I'm gay." *Id*. at 79:13-21. Tyndall recalled that "[w]hen the comments became more frequent," perhaps "up until about 2008," Tyndall felt uncomfortable and then he "stopped walking" with Trimble. *Id*. 80:4-16.

In 2008, after turning 18 and then graduating from high school, Tyndall became eligible to serve as a volunteer firefighter, rather than only as a cadet. It appears that he began serving as a volunteer firefighter as soon as he became eligible. ECF 55-6 at 40:9-21.

Sometime in 2008, apparently not long after Tyndall graduated from high school and became a volunteer firefighter, he also started working for BFC as a paid, part-time EMT. Tyndall Depo. Pt. Two, ECF 55-6 at 32:7-17. Around the same time, Tyndall also started working part-time as an EMT for the Ocean City Fire Department. *Id*. at 32:10-21. In approximately May 2010, Tyndall was hired as a full-time EMT-B at BFC. Fitzgerald Aff., ECF 54-7 ¶ 11; Tyndall Depo. Pt. One, ECF 54-12 at 34:1-21.

- 11 -

In his Memo, Tyndall asserts that from 2009 through 2012 the name-calling "escalated from being occasional to being an everyday occurrence." ECF 55 at 3. Trimble and Simpson claim that they continued to call Tyndall offensive names after Tyndall became a paid employee at BFC, *i.e.*, beyond 2008, but not beyond 2011. Trimble states that he last called Tyndall names in "[p]robably 2011," and that he did not call Tyndall names in 2012 or 2013. Trimble Depo. Pt. One, ECF 54-9at 115:2-13. But, as stated, in another part of his deposition, Trimble acknowledged that "Gay Boy" was Tyndall's "nickname" "throughout" his "career at the firehouse." Trimble Depo. Pt. Two, ECF 55-8 at 69:1-21, 70:1-14. Simpson states that he last called Tyndall "gay boy" or "homo" in 2010. Simpson Depo. Pt. One, at 69:2-15. According to Donohoe, Trimble and Simpson called Tyndall names such as "Gay Boy, homo, fag, faggot" a couple of times a week as late as 2012. Donohoe Depo. Pt. One, ECF 54-11 at 62:10-1, 63:1-10.

According to Tyndall, Donohoe also frequently called Tyndall names. Indeed, it appears Donohoe was the most frequent name-caller. Tyndall describes the progression as follows, Tyndall Depo. Pt. Two, ECF 55-6 at 95:20-22, 96:1-13:

> Q  And when did Mr. Donohoe start referring to you as gay?
>
> A  The exact date of him starting with that, I don't know. But it progressed with my employment there and it became something that was very minimal and occasional, I should say, in the beginning to something that morphed into an everyday occurrence on how I was addressed with my employment, up until the point he was – up until the point he was fired.
>
> Q  So it started out as an occasional reference to you as being gay to the point where every day he would refer to you as gay?
>
> A  I no longer had a name.
>
> Q  All right.
>
> A  I was referred to as gay boy, gay partner, faggot, et cetera.

- 12 -

Starting sometime in 2011 and continuing in 2012, *see, e.g.*, ECF 55-6 at 212:3-6, Tyndall states that Trimble and Simpson began criticizing his personal choices.  He summarized this as follows, *id.* at 207:12-19:

> Q  What led you to believe that those individuals [Trimble, Simpson, and Fitzgerald][5] considered you to be effeminate?
>
> A  They would constantly make comments about my hair, my clothing, the way I ate, the way I carried myself in general, the vehicle I drove, how well I can decorate my home, the home I live in, the way that my relationship is with my mother.  I think that covers most of it.

Tyndall provided additional detail.  He explained that, for example, Trimble criticized Tyndall's facial hair, because Trimble "thought that not being able to grow facial hair, a man should be able to grow a beard like other employee, [sic] I guess, but my stubble was not acceptable."  Tyndall Depo. Pt. One, ECF 54-12 at 211:1-5.  Similarly, Tyndall said:  "I have different colored shirts, some of them may be a little on the bright side, … the purples and the pinks, and [Trimble] felt that a man shouldn't wear those colors or that style of shirt … ."  *Id.* at 211:15-20.  In response to such bright shirts, according to Tyndall, Trimble would say, "'That shirt's gay.  You're definitely gay, look at what you have on.'"  *Id.* at 212:1-2.  Trimble also criticized Tyndall's food choices, saying things like, "'You're gay, look at what you're eating, you're eating salads.  What are you trying to do, lose weight?'"  *Id.* at 213:6-10.  Further, Trimble criticized Tyndall's car as a "feminine Jeep that resembled a Jeep that a girl would drive," *id.* at 214:4-10, and criticized Tyndall's use of "Coastal Living" magazine for home décor tips, and claimed that Tyndall must be gay because "only a gay guy would decorate [his

---

[5] Shortly after this question, Tyndall testified that he could not recall Fitzgerald making the same comments about Tyndall that Trimble and Simpson made.  *See* ECF 54-12 at 210:1-4.

home] that well." *Id*. at 215:1-9.   Trimble also asserted that Tyndall must be gay because he had

such a good relationship with his mother. *Id*. at 216:8-18.   Simpson generally "followed along a

lot with [Trimble's] comments" on each topic. *Id*. at 217:10-17.   Simpson also thought Tyndall's

habit of wearing button-down shirts with jeans and his failure to drive a truck like the rest of the

guys showed that Tyndall was gay.   *Id*. at 218:8-14, 219:3-7.

Also starting in 2011 and continuing through 2012, Trimble and Simpson singled out

Tyndall for what Tyndall says everyone called "bitch work."   *See*, *e.g.*, Tyndall Depo. Pt. Two,

ECF 55-6 at 268:7-17; *id*. at 104:3-21.   For example, Tyndall was repeatedly asked to clean

Trimble's "vehicle at the firehouse" and to reclean the latrines.   *Id*. at 237:18 through 243:15.

Tyndall states other people "were required to do [these things] as part of their job, but they

weren't required – they were not asked to reclean things they have already cleaned, or

specifically told to clean something by themselves without the assistance of their partner, like I

was." *Id.* at 243:19-22, 244:1-2.

Trimble told Tyndall that Tyndall should start "sucking [Trimble's] dick for [work]

shifts."   Tyndall Depo. Pt. One, ECF 54-12 at 99:13-18.   Tyndall recalled:   "[Trimble] was

convinced that I was sucking the person that's in charge of scheduling in Ocean City, he said I

was sucking his dick for shifts, and I needed to start sucking [Trimble's] dick for shifts if I

expect to work there [at BFC]." *Id*. at 99:13-18. According to Tyndall "[s]ometime in between

2011 and 2012," Tyndall resigned from the position he had simultaneously maintained with the

Ocean City Fire Department, because Ocean City wanted him to do "live fire training" with Trimble and Simpson, among others, and Tyndall "did not feel safe." *Id*. at 175:5-22.[6]

Trimble did not call other members of the BFC the same offensive names that he called Tyndall. He stated, for example, Trimble Depo. Pt. Two, ECF 55-8 at 130:17 through 132:1:

Q  Did you ever call Eric Budd gay, gay boy, faggot, fag, homo, queer?

A  No.

Starting sometime in 2011 and into early 2012, Tyndall began reporting the behavior of Trimble and Simpson to BFC officers, including Fitzgerald; "Phil Simpson, the chief engineer"; and John Holloway, "the chairman of the board." *See* Tyndall Depo. Pt. One, ECF 54-12 at 100:2-16; *see also*, *id.* at 101-103, 108-109. Tyndall also discussed his concerns with Donohoe, *e.g.*, *id.* at 100:2-16, and with Bill Tilghman, who was Chief in 2011. *E.g.*, *id.* at 115:7-16, 116:11-21.

By February 2012, Tyndall decided to report his colleagues' offensive conduct to officials of the Town. *E.g.*, Tyndall Depo. Pt. One, ECF 54-12 at 126. He explained his decision as follows:

Q  What precipitated you making the report to the Town of Berlin?

A  I had gone through what I – what was explained to me as my chain of command within the [BFC], asking them to please get this behavior to stop. I had received no – nobody had changed anything. The behavior that I was experiencing at the firehouse was unchanged; if anything, it became worse based on my requests to these individuals to stop.

---

[6] A "Forensic Evaluation" of Tyndall, completed by a clinical psychologist on the basis of five "Dates of Evaluation" in November 2012, indicates that Tyndall remained affiliated with the Ocean City Fire Department through at least the Summer of 2012, although he obtained intermittent leaves of absence starting in May 2012. *See* ECF 55-28 at 5-6.

And I had opened my Town handbook which was given at the time that I was hired by the Town of Berlin human resources department, and I opened the book, and it said if this behavior involves your supervisor, it needs to be reported to the Town Administrator.  So I followed the chain of – or I followed the policy outlined in my handbook, which led me to Tony Carson's office, and I reported it on February 24th.

Tyndall also recalled that the night before his meeting with Tony Carson, Trimble went into a "rage" with Tyndall and another employee, Jeff Dean, about a missed phone call.  Tyndall Depo. Pt. One, ECF 54-12 at 123:18-22, 124:1-22.  Tyndall asked Trimble, "'Why do you treat me differently?,'" to which Trimble responded something like, "'I don't know, but I took office this year to have you fired'." *Id.* at 125:1-12.

Following Tyndall's meeting with Carson, Tyndall felt that, in general, his working environment got more hostile, not less.  *See*, *e.g.*, Opposition, ECF 55 at 8.  However, it appears that most of the conduct alleged during this period relates to Tyndall's retaliation claim, included in Count III of his Third Amended Complaint, which is not at issue in the Motion.  *See*, *e.g.*, *id.* (describing incidents after February 24, 2012 under the sub-heading, "Retaliation Against Zackery by BFC"); *id.* at 11 (describing how "BFC ramped up its retaliation against Zackery" later in 2012).  Moreover, most of it does not involve Trimble or Simpson, at least not directly.  *See*, *e.g.*, *id.* at 8 (stating Fitzgerald announced to BFC membership that Tyndall had complained to Berlin); *id.* at 8-9 (relating threatening comments supposedly made to Tyndall by other BFC members); *id.* at 11 (stating Brown, as Chief, began "taking written disciplinary action against Zackery for things like leaves in the garage bay and a sugar packet left behind a trash can in the BFC coffee room").  Because Count III is not at issue here, I will only relate in detail evidence from this period that appears pertinent to Tyndall's IIED claims against Trimble and Simpson.

By way of background, Tyndall's meeting with Carson did produce results.   Town officials conducted an investigation of Tyndall's complaints, as well as some related complaints apparently lodged by Tyndall's colleagues during the investigation.   *See*, *e.g.*, Ex. D to Opposition, ECF 55-9 at 2 (Memorandum to "Mayor and Council" of the Town of Berlin from David C. Gaskill, Esq., dated March 13, 2012).   An attorney working for the Town concluded that "the allegations of discriminatory practices based upon sexual orientation, race and sex were corroborated and found to be credible."   *Id.* Town officials, in consultation with the attorney, made two specific disciplinary recommendations, and six policy recommendations, relating to Town supervision of BFC employees.   *Id.* at 3-4.   Soon after, in April 2012, the Town suspended Donohoe; it fired him in May 2012.   Deposition of Norris P. Donohoe, Ex. B. to Opposition, ECF 55-7 ("Donohoe Depo. Pt. Two") at 21:3-20.   In June or July 2012, Trimble resigned his position as Chief.   Trimble Depo. Pt. One, ECF 54-9 at 51:2-5.

On August 16, 2012, Fitzgerald delivered a statement to the "Mayor and Council" of Berlin, announcing that BFC would "assume full control" over its paid employees immediately. *See* Ex. F to Opposition, ECF 55-11 at 2 (BFC Statement); ECF 55 at 11.   Berlin ended its formal relationship with BFC at the end of August, voiding its employment agreement and withholding approximately half a million dollars in grant money allocated for BFC.   *See* Ex. G to Opposition, ECF 55-12 at 4-6 (letter from the Mayor to citizens of Berlin, dated Aug. 22, 2012).

Again, Tyndall argues that things got worse, not better.   *See* ECF 55 at 11.   Indeed, one of the most traumatic incidents for Tyndall occurred on December 26, 2012.   *See id.* at 12. Around noon on that date, emergency responders were called to the scene of a motor vehicle accident, in which one vehicle collided with the passenger side of another.   *Id.*   Tyndall was at

the firehouse; he responded to the call, and arrived alone at the scene via ambulance.  Tyndall

Depo. Pt. Two, ECF 55-6 at 315:16-21, 316:1-5.  He worked with other BFC EMS personnel to

extricate the driver of the vehicle, who was conscious and alert.  *Id*. at 322:1-16.  He then

crawled through the driver's side to reach the passenger, who was unconscious, and positioned

himself partially outside the vehicle.  *Id*. at 323:8-22, 324:7-13.  While Tyndall was in that

position, working with the passenger, Trimble was using "Jaws of Life" equipment to cut the

passenger out of the vehicle.  *Id*. at 325:15-22, 326:1-8.  Tyndall felt that Trimble came close to

his arm with the tool, and so he said, "'Hey my arm's here'" to Trimble.  *Id*. at 326:4-13.  In

response, Tyndall says Trimble "just looked at" him; he did not "alte[r] what he was doing," but

he did not injure Trimble.  *Id*. at 326:14-22, 327:1-2.  After that, Tyndall says he repeatedly

consulted Trimble about a particular medical procedure, and whether Tyndall should use it on

the passenger; Trimble was sometimes working with the extrication tool and sometimes just

holding it, but he did not respond to Tyndall's questions.  *Id*. at 327:11-22, 328:1-8.  Tyndall

does not know "a hundred percent" whether Trimble heard him, but he believes it would have

"been difficult" for Trimble not to hear him.  *Id*. at 328:16-22, 329:1-2.  Tyndall believes

Trimble pointedly refused to answer or assist him.  *Id*. at 328:9-22, 329:1-4.

Tyndall felt all the while that other BFC members were similarly refusing to answer his

calls for help.  He recalls asking numerous other BFC members for help along the way, but

received only stares from most of them.  ECF 55-6 at 329-335.  Eventually, a state trooper

helped Tyndall connect an oxygen tank to a ventilation bag, *id*. at 332:1-3; two BFC cadets

helped him move the passenger into an ambulance, *id*. at 335:16-22, 336:1-21; and a Berlin

police officer drove the ambulance to the hospital while Tyndall worked with the passenger in

the back.  *Id.* at 338:7-9.  Tyndall was assisted in the ambulance by Collins Brown, the son of

then-Chief Marc Brown.  Tyndall Depo. Pt. Two, ECF 55-6 at 340:15-20; Deposition of Marcus

N. Brown, Ex. E to Opposition, ECF 55-10 at 52:1-21.  According to Tyndall, about thirteen

BFC firefighters qualified to drive the ambulance were on the scene.  Trimble Depo. Pt. Two,

ECF 55-8 at 207:14-21, 208:1-16.  Tyndall related that before the police officer responded, he

had "requested a driver," was "ignored," and was told "'I can't'" by numerous people.  *Id*. at

338:3-6.

In support of Tyndall reported the incident, and the concerns he had about it, to Fitzgerald and Marc

Brown, via email on December 26, 2012.  Ex. O to Opposition, ECF 55-20 at 2 (email).  About

one month later, in January 2013, the BFC "Employment Committee," including Fitzgerald,

Marc Brown, John Holloway and two others, decided to fire Tyndall.  Deposition of David A.

Fitzgerald, Ex. P to Opposition, ECF 55-21 at 45:2-17.

In support of Tyndall's claim that his emotional distress as a result of the preceding facts

was "severe," Tyndall submitted with his Opposition two documents titled "Forensic

Evaluation."  *See* ECF 55-28 ("2012 Eval."); ECF 55-29 ("2014 Eval.").  Defendants have not

challenged or discussed these submissions in their Reply.  *See* ECF 58.

Both evaluations were completed by Michael Finegan, Ph.D.  *See* Affidavit of Michael

Finegan, ECF 57-1 ("Finegan Aff.").  Finegan is a clinical psychologist who currently serves as

"the Executive Director of Peninsula Mental Health in Salisbury, MD and its divisions," *id.* ¶ 3,

as well as "Lead Psychologist for the Maryland State Police, heading a statewide emergency

response team … ."  *Id.* ¶ 4.  The evaluations contain "facts from [Finegan's] clinical interviews

of [Tyndall] as well as [Finegan's] conclusions and opinions."  *Id.* ¶ 6.

In his 2012 Eval., Finegan concluded that Tyndall "developed a Major Depressive Disorder with associated anxiety during the calendar year 2012." ECF 55-28 at 10.  Finegan reported that this development was manifested "by sleep disturbance, avoidant behaviors and situational anxiety when [Tyndall] is exposed to environments reminding him of his abuse experiences," as well as a "reduction in energy, feelings of helplessness and depressive rumination." *Id.*  According to Finegan, Tyndall denied experiencing such feelings before 2012. *Id.*  Finegan attributed the change to what Tyndall "experienced through his affiliation with the fire company." *Id.*  In particular, Finegan stated:  "Tyndall's occupational stress primarily involves the humiliation and discomfort he felt by the repeated statements from his supervisors that he was a homosexual," and "was further compromised by the helplessness that he experienced as a result of the sexually harassing behaviors continuing despite numerous attempts on his part to have … [it] stop." *Id.*

In a section of the 2012 Eval. titled "Mental Status," Finegan also indicated that Tyndall experienced "a sense of impending diarrhea" and "has experienced vomiting, nausea, sweating and motor shaking" while at the firehouse.  ECF 55-28 at 9.  He also reported that Tyndall "stopped working" from "September 12 through October 30, 2012" and experienced "excessive crying" at that time.  *Id.*  Finegan also noted that Tyndall's "two-year relationship with his girlfriend end[ed] in October 2012." *Id.* at 7.

According to the 2014 Eval., Tyndall no longer reported the symptoms catalogued in the 2012 Eval.  ECF 55-29 at 7.  Finegan concluded:  "As of the summer of 2014, Mr. Tyndall's Major Depressive Disorder has been resolved." *Id.*

### C. Tyndall's Conduct

As stated, defendants do not expressly dispute the vast majority of Tyndall's allegations concerning his co-workers' conduct.   Rather, in their Memo, they provide a list of his allegations, ECF 54-5 at 33- 37, and characterize them as mere "teasing and horseplay."   *Id*. at 33.   However, in addition, they provide a second bullet-point list of Tyndall's own teasing/horseplay conduct, as described by Trimble, Simpson, and Donohoe.   *Id*. at 37-38.

According to Trimble, Tyndall called Trimble names and made fun of him.   He stated, Trimble Depo. Pt. One, ECF 54-9 at 84:18-21, 85:1-3:

> Q   And how would [Tyndall] tease you?
>
> A   Just tell me that I need to get out and run more, walk more, eat less, just, in my opinion, fun joking.   But my hair loss, it's always been as thin as it is now, but everybody teases me about it.
>
> Q   Does it bother you?
>
> A   Not anymore, no.

Simpson claimed that Tyndall would "pick on [Trimble] about getting fat and about [Trimble's] hair."  Simpson Depo. Pt. One, 80:1-18.  According to Donohoe, during 2012 Tyndall called Trimble an "old, bald-headed man on occasion," Donohoe Depo. Pt. One, ECF 54-11 at 90:12-18, "[m]ore than one or two times but, … no more than ten times, maybe."  *Id*. at 91:1-5.   Donohoe also said that Tyndall, "on occasion," *id*. at 98:8-14, called him names, "maybe" "three or four" times in 2011 and 2012.  *Id*. at 99:1-2.  He stated, *id*. at 98:8-14:

> Q   Did Zack ever refer to you as an old-timer, old fuck, old man?
>
> A   Sure did.
>
> Q   When?

A   On occasion he called me, what are you doing, Old-timer, what are you doing, Old Man, you're just an old fuck.

Trimble said that he had heard Tyndall call Donohoe "Old-Timer" and "Old Man", but not "Old Fuck."  Trimble Depo. Pt. One, ECF 54-9 at 92:16-21, 93:1-6.

Simpson reported that on an unspecified number of times, Tyndall called him a "homo" but then Tyndall would pause and add "sapien."  Simpson Depo. Pt. One, 87:4-17.  Simpson explained:  "He'd say, I didn't call you a homo, I called you what you are, a homo sapien."  *Id.* Simpson also said that Tyndall called Trimble "gay and faggot," *id.* at 87:4-6; that Tyndall called another BFC member, Glenn Baublitz, "old man" and "homo," *id.* at 88:6-12; and that Tyndall called Baublitz "gay and faggot" "all the time."  *Id.* at 86:3-8.  Tyndall also called Simpson a "derelict" on an unspecified number of times.  *Id.* at 72:21.

Defendants and Donohoe also asserted that Tyndall called himself names.  They all said that he called himself "Big Daddy."  *See*, *e.g.*, Donohoe Depo. Pt. One, ECF 54-11 at 92:14-18; Simpson said it happened "all the time," and that "[i]t was just a running joke" that Tyndall would say to Simpson's wife, when he encountered her at the hospital where she worked, "'If you need Bid Daddy to come take care of you, I will.'"  Simpson Depo. Pt. One, 82:16-18, 83:1-20.  According to Simpson, Trimble also called himself "Big Daddy," and "Zack would say, I'm the real Big Daddy."  *Id.* at 83:1-3.  Simpson and Donohoe said that Tyndall also called himself the "Rainbow Coalition" in a joking manner.  Simpson Depo. Pt. One, 84:4-10 (stating he heard it "a few times" between 2009 and 2012); Donohoe Depo. Pt. One, ECF 54-11 at 95:1-15 (stating he heard it "[t]wo or three times").  And, Simpson said that "lots of times" Tyndall answered his phone by stating "Homo Anonymous."  Simpson Depo. Pt. One, 79:10-15.

- 22 -

The deponents reported other scattered comments.  As stated in defendants Memo, "Tyndall would say things like 'that was an orgasm in my mouth' while eating yogurt covered raisin[s]," and "[i]n 2012, Tyndall asked Trimble and/or Simpson whether they were the pitcher or the catcher.'"  *See* ECF 54-5 at 37 (citing Simpson Depo. Pt. One, 78:9-21, 79:105, 81:7-21; Donohoe Depo. Pt. One, ECF 54-11 at 91:10-21, 92:6-10).  According to Simpson, after Tyndall had complained to the Town, Tyndall said, at an accident scene, that another member of BFC "liked it up the ass" when Simpson warned that member that the member's rear was near an extraction tool.  Simpson Depo. Pt. One, 84:11-21, 85:1-21.  Trimble asserted that "several years ago," Tyndall sent him a text or texts implying that Tyndall would "sexually satisfy" his wife.  Trimble Depo. Pt. One, ECF 54-9 at 94:18-21, 95:1-15.  He stated, in part:  "Yeah, he would text me and ask what time I'd be home from work or be home from wherever I was, and he'd say, good, that will give me time to stop by the house and take care of Momma or whatever."  *Id.* at 95:3-7.  Simpson recalled Trimble showing him one such text from Tyndall, characterizing it as "all in good fun and joking."  Simpson Depo. Pt. One, 91:6-15.

Trimble and Donohoe also maintained that Tyndall would sometimes touch or grab other male BFC members on their buttocks.  Trimble said Tyndall would "goose" people, meaning "smack them on their butt like you see football players do … ."  Trimble Depo. Pt. One, ECF 54-9 at 91:13-19.  Tyndall "goosed" Trimble, sometime "before 2011."  *Id.* at 92:8-11.  And he goosed Glenn Baublitz, who "[w]hen you slapped him on his butt, he would jump like, 10 feet, so he got goosed quite a bit by everybody."  *Id.* at 92:2-7.  According to Donohoe, Tyndall "liked to play games," such as "acting as a queer sometimes", by grabbing "a male's butt or a male's breasts."  *Id.* at 54:16-21, 55:1-7.  Specifically, Donohoe stated that Tyndall grabbed

his "butt" and "breasts" twice in one evening, "[p]robably in 2011." *Id*. at 55-58.  Donohoe asked him to stop, and Tyndall did not do it again.  *Id*. at 58:16-21, 59:1-3.

### D.  Administrative Proceedings & Procedural History

Tyndall initiated proceedings before the Maryland Commission on Civil Rights ("MCCR") and the Equal Employment Opportunity Commission ("EEOC") on December 5, 2012, by sending, through counsel, a letter outlining his concerns about harassment at BFC.  *See* Ex. J to Opposition, ECF 55-15 at 2-5.  It is not entirely clear how many formal Charges of Discrimination Tyndall filed with the EEOC thereafter, or when the charge or charges were submitted to the EEOC.

Sometime on or before March 28, 2013, Tyndall received a two-page Charge of Discrimination from the EEOC for his review.  Ex. S to Opposition, ECF 55-24 at 2-3 ("EEOC Charge").  The EEOC Charge shows an "Agency Charge No." of 12F-2013-00249 in the upper-right-hand corner.  *Id.* at 2.  On March 28, 2013, Tyndall signed and dated the document in a box located at the bottom of both pages, which included the following text:  "I declare under penalty of perjury that the above is true and correct."  *Id.*  at 2-3.  He did not sign a line following the word "Authorization" at the end of the Particulars section of the EEOC Charge.  The particulars of the charge are addressed below in the Discussion.

In his Opposition, Tyndall represents:  "On March 28, 2013, Plaintiff completed and executed a Charge of Discrimination which supplemented his original complaint to EEOC and MCCR."  ECF 55 at 22.  In reference to the EEOC Charge, Tyndall states:  "The Charge of Discrimination included an EEOC Intake Questionnaire that was completed by Plaintiff Tyndall … ."  ECF 55 at 22-23.  Exhibit S includes a copy of an EECO Intake Questionnaire, which is

also signed by Tyndall and dated March 28, 2013.  ECF 55-24 at 5-7.  The sequence "531-2013-00501N" is handwritten in the upper right-hand corner of the Intake Questionnaire.  *Id*. at 5.  In answer to questions 6 and 7 of the Intake Questionnaire, Tyndall is asked to describe why certain alleged actions were discriminatory, and what reasons for those actions were given to him.  He wrote only, "See charge of discrimination."  *Id*. at 6.  In addition, Exhibit S includes a one-page typed document titled "Supplement to Complaint," again signed by Tyndall on March 28, 2013.  *Id*. at 8.  In light of the foregoing, it appears that Tyndall collectively submitted to the EEOC, as one package and one "charge," the EEOC Charge, the Intake Questionnaire, and the one-page supplement to the EEOC.  Further, it appears that this "charge" was submitted to the EEOC on March 28, 2013, although this is not certain.

On June 20, 2013, Tyndall received a "right to sue letter" from the EEOC, which stated the EEOC had closed its investigation in relation to EEOC Charge No. 531-2013-00501.  *See* Ex. T to Opposition, ECF 55-25 at 2 ("Right to Sue Letter").[7]  It also appears that sometime later in 2013, Tyndall filed a second formal Charge of Discrimination, related to his termination and retaliation claims.  *See* ECF 55 at 23.  He received another right to sue letter from the EEOC, dated August 12, 2014, for EEOC Charge No. 531-2013-2140.  *See* Ex. U to Opposition, ECF 55-26 at 2.  The allegations in that EEOC Charge pertain to Count III of the Third Amended Complaint, which is not at issue in the Motion.

Tyndall filed suit in this Court on August 27, 2013.  ECF 1.  In response to defendants' first motion to dismiss (ECF 9), Tyndall filed his first Amended Complaint.  ECF 18. Defendants filed a second motion to dismiss (ECF 20) in October 2013, which I granted in part

---

[7] The Charge No. listed on the Right to Sue Letter does not match the "Agency Charge No." assigned to the EEOC Charge Tyndall signed on March 28, 2013.  *Id*.

and denied in part in December 2013.  ECF 26.  Tyndall filed a second Amended Complaint in December 2013.  ECF 27.  In October 2014, near the end of discovery, and after receiving the second Right to Sue letter mentioned above (ECF 55-26), Tyndall filed a Motion for Leave to File a Third Amended Complaint (ECF 48), which I granted on November 18, 2014.  ECF 52 (Order); ECF 53 (Third Amended Complaint).  The Third Amended Complaint was the first to allege, in Count III, that BFC violated Title VII by retaliating against him and by terminating him.  *Compare* ECF 27-1 (redlined version of Second Amended Complaint) *with* ECF 53 (Third Amended Complaint).  The Scheduling Order (ECF 40) set a dispositive motions deadline of November 21, 2014.

Defendants filed the pending Motion on November 21, 2014 (ECF 54), without seeking to modify the Scheduling Order (ECF 40).  In their Memo defendants made the following request:  "Given that the Court granted Plaintiff's Motion for Leave to File Third Amended Complaint three (3) days prior to the dispositive motion's [sic] deadline, Defendants respectfully request leave to supplement the Motion herein to address the newly alleged claims of harassment and retaliation (Count III) at the appropriate time."  ECF 54-5 at 3.  However, defendants did not pursue the request to supplement the existing Motion.[8]

Additional facts are included in the Discussion.

## II.  Standard of Review

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to

_____

[8] If, after reviewing this Memorandum, BFC wishes to file a dispositive motion as to Count III, it may make such request by way of a motion to modify the Scheduling Order.

any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248.  There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; *see Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must  'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  Moreover, the trial court may not make credibility determinations on summary judgment.

*Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Indeed, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See*, *e.g.*, *Boone v. Stallings*, 583 F. App'x. 174 (4th Cir. 2014) (per curiam).

However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

### III. Discussion

### A. Title VII

### 1. Administrative Exhaustion

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014). It also prohibits an employer from discriminating

against an employee because the employee has filed a grievance or complaint regarding an employment practice that allegedly violates Title VII's antidiscrimination provision. *See* 42 U.S.C. § 2000e-3(a).

However, a potential plaintiff must file a charge with the EEOC before filing suit in a federal court under Title VII. 42 U.S.C. § 2000e-5(f)(1) (2006) (permitting civil suit by the "person claiming to be aggrieved" after filing of a charge with the EEOC and upon receipt of a right-to-sue letter); *see also*, *e.g.*, *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *Puryear v. Cnty. of Roanoke*, 214 F.3d 514, 518 (4th Cir. 2000). This "exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible." *Miles*, 429 F.3d at 491; *see also Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 670 (4th Cir. 2015) ("We recognize that a primary objective of exhaustion requirements is to put parties on notice of the allegations against them.").

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Institution*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, together with the agency investigation and settlement process it initiates, the requirement "'reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes.'" *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013) (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)).

Title VII's exhaustion requirement also functions as a jurisdictional bar in federal courts where plaintiffs have failed to comply with it. In *Balas*, 711 F.3d at 406, the Court said: "[F]ederal courts lack subject matter jurisdiction over Title VII claims for which a plaintiff has

failed to exhaust administrative remedies."  Even when, as here, a plaintiff has filed a claim with

the EEOC, a court cannot consider matters that were not properly raised during the EEOC

process.  *See, e.g., Miles*, 429 F.3d at 491.[9]

Upon review, "[t]he touchstone for exhaustion is whether plaintiff's administrative and

judicial claims are 'reasonably related,' not precisely the same … ."  *Sydnor v. Fairfax Cnty.*,

681 F.3d 591, 595 (4th Cir. 2012).  "'Only those discrimination claims stated in the initial

charge, those reasonably related to the original complaint, and those developed by reasonable

investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'"

*Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (quoting *Evans v. Technologies*

*Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996)).

In this case, BFC argues that, as to Count I, Tyndall failed to exhaust his claim under

Title VII because "Tyndall's EEOC Charge did not allege that he was discriminated against on

the basis of gender stereotyping".  ECF 54-5.  Rather, BFC points out that Tyndall "filed an

EEOC Charge alleging that he believed that he was subject to unlawful discriminatory conduct

because of sexual orientation".  *Id.*  In his Opposition, Tyndall argues, first, that the "Charge of

Discrimination included an EEOC Intake Questionnaire that was completed by Plaintiff Tyndall

in which he checked the box for 'sex' in response to the question 'What is the reason (basis) for

your claim of employment discrimination?'"  ECF 55 at 22-23.  Further, Tyndall notes that the

"word 'gender stereotyping' was not a choice on the EEOC form."  *Id.* at 23.  Second, in any

---

[9] Federal Rule of Civil Procedure 12(b)(1) governs a federal court's consideration of a challenge to its subject matter jurisdiction.  However, because I may consider evidence outside the pleadings under both Rule 12(b)(1) and Rule 56, and because the facts at issue here, *i.e.*, the contents of Tyndall's EEOC Charge, are undisputed, I need not specially discuss how the Rule 12(b)(1) standard shapes my consideration of the issue.

event, Tyndall argues that it "is clear from the factual statements made by Plaintiff Tyndall in the

EEOC complaints that the complaints are related to sex discrimination and gender stereotyping

and not sexual orientation as Plaintiff Tyndall is not a homosexual." *Id.*

As indicated in the Factual Background, it is undisputed that Tyndall filed a Charge of

Discrimination, dated March 28, 2013, that forms the basis for his allegations in Count I. *See*

EEOC Charge, ECF 55-24 at 2-3.   Tyndall also argues that the EEOC Charge "*included* an

EEOC Intake Questionnaire." ECF 55 at 23 (emphasis added).   Of import here, an EECO Intake

Questionnaire, dated March 28, 2013, is appended to the EEOC Charge in Exhibit S to Tyndall's

Opposition.  ECF 55-24 at 5-7.

The EEOC Charge itself includes a box titled "Discrimination Based On", which includes

ten empty boxes, each one next to a basis for discrimination.  ECF 55-24 at 2.  The boxes next to

"Retaliation" and "Other" are checked.   And, next to the box checked "Other", the words

"Sexual Orientation" are typed.  *Id.*  The box next to "Sex" is not checked.  *Id.*  But, on the

EEOC Intake Questionnaire appended to the EEOC Charge, Tyndall checked the boxes next to

"Sex" and "Retaliation".  *Id.* at 6.

In a separate section of the EEOC Charge, titled "The Particulars Are", the following

relevant allegations are typed, *id.*:

> I believe that I have been discriminated against on the basis of my sexual
> orientation because:

> I am a heterosexual male who has been employed full time by the
> Respondent [BFC] as a Paramedic since 2008. …

> Over the last few years, I have been singled out by former EMS
> Supervisor, Norris P. Donohue [sic], Jr., Assistant Fire Chief Derrick Simpson
> and Fire Chief Bryon Trimble.  They have called me a 'faggot, a homo, queer,
> cocksucker' and other pejorative names.  They have accused me of being a

homosexual despite my clear statements to the contrary.  They have made fun of me in front of other fire personnel. …

*** 

I believe that the Respondent's behavior is based on my co-worker's erroneous assumption that I am homosexual.

The Fourth Circuit has consistently found that plaintiffs failed to exhaust claims where the complaint alleged a violation on a forbidden basis (*i.e.*, race or sex) not alleged in any EEOC Charge.  *See Calvert Grp.*, 551 F.3d at 301 (plaintiff failed to exhaust claim for racial discrimination because EEOC Charge alleged only retaliation); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132–33 (4th Cir. 2002) (plaintiff failed to exhaust claim for sex discrimination because EEOC Charge alleged only racial discrimination); *Evans*, 80 F.3d at 963 (plaintiff failed to exhaust claim for age discrimination because EEOC Charge alleged only sex discrimination).

The Fourth Circuit has also made clear that a court's consideration is limited to the EEOC Charge itself.  *Balas*, 711 F.3d at 408.  That is, courts cannot look to an EEOC Intake Questionnaire to determine exhaustion.  *Id*. at 409 ("Any Title VII claims based on allegations included only in [plaintiff's] intake questionnaire and letters are … outside the jurisdiction of the federal courts.").

Nonetheless, I am satisfied that Tyndall has exhausted administratively his sex-based discrimination claim.  This is because the claim alleged in his judicial complaint is reasonably related to the particulars alleged in his EEOC Charge.

Although it is true that Tyndall failed to check the box next to "Sex" in the EEOC Charge itself, my review is not limited to checkboxes alone; it also includes the facts alleged by Tyndall.  *See Miles*, *supra*, 429 F.3d at 491-92 ("In short, Miles' charge does not remotely allege that Glaze retaliated against her because she had complained of his discriminatory conduct to his

supervisor, and it does not otherwise allege facts that would have put Dell or the EEOC on notice that she was charging Dell with retaliation."); *Maynor v. Mt. Washington Pediatric Hosp.*, WMN-14-02741, 2015 WL 1242643, at *5 (D. Md. Mar. 17, 2015) (considering entirety of the EEOC Charge); *Cohens v. Md. Dept. of Human Res.*, 933 F. Supp. 2d 735, 743 (D. Md. 2013) (dismissing retaliation claim where the plaintiff "neither checked the 'retaliation' box on her EEOC charge nor alleged retaliation in the charge's factual summary").  In other words, it is well established that a plaintiff may exhaust claims administratively by clearly alleging the relevant facts.  A contrary rule would elevate form over substance; "the exhaustion requirement should not [in that way] become a tripwire for hapless plaintiffs."  *Sydnor*, 681 F.3d at 594.

I agree with Tyndall that the facts he alleged in his EEOC Charge effectively put BFC on notice of a claim under Title VII alleging sex-based discrimination.  The Charge states that Donohoe, Simpson, and Trimble called Tyndall "a 'faggot, a homo, queer, cocksucker' and other pejorative names"; they "accused [Tyndall] of being a homosexual despite [his] clear statements to the contrary"; and they "made fun of " Tyndall "in front of other fire personnel."  ECF 55-24 at 2.  The Charge also states that Tyndall is "heterosexual", which on its face suggests that Tyndall's complaint did not pertain to sexual orientation.  In addition, Tyndall complains that his co-workers "made fun of " him.  As indicated earlier, Tyndall elaborates on these assertions in his suit.  *See supra* at 13-14.  But, the same factual allegations that appear in the EEOC Charge are at the heart of Tyndall's claim in Count I of the Third Amended Complaint.  There is no surprise here for BFC; there is more detail.

Accordingly, I am satisfied that Tyndall has exhausted his claim that BFC discriminated against him on the basis of sex.  *See id.*; *see also Robertson v. Siouxland Community Health*

*Center*, 938 F. Supp. 2d 831, 845-46 (N.D. Iowa 2013) (finding plaintiff exhausted claim for sex-based discrimination where the facts alleged in EEOC Charge supported a claim for same-sex sexual harassment, even though plaintiff checked a box indicating she was *not* alleging sex-based discrimination).

## 2. Applicability of Title VII to BFC

"Title VII of the Civil Rights Act of 1964 applies to any employer who 'has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.'" *Walters v. Metro. Educ. Enterprises, Inc.*, 519 U.S. 202, 204 (1997) (quoting 42 U.S.C. § 2000e(b)); *see also Butler v. Drive Automotive Industries of America, Inc.*, ___ F.3d ___, No. 14-1348, slip op. at 7 (4th Cir. July 15, 2015). Although defendants assert that this threshold fifteen-employee requirement limits this Court's subject matter jurisdiction, the Supreme Court has made clear that it "is an element of a plaintiff's claim for relief, not a jurisdictional issue." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006).

In this case, BFC argues that, during Tyndall's employment, BFC had only a maximum of eleven paid employees. *See* Memo, ECF 54-5 at 26; Fitzgerald Aff., ECF 54-7 ¶ 6. Therefore, it concludes that Title VII does not apply to it. ECF 54-5 at 26. In response, Tyndall argues that Title VII governs because BFC's volunteer members are properly considered "employees" within the meaning of Title VII and, therefore, BFC had many more than fifteen employees. Opposition, ECF 55 at 18-19.

The language of Title VII provides little guidance as to the meaning of "employer" and "employee." The statute simply defines an "employer" as a "person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty

or more calendar weeks in the current or preceding calendar year … ."  42 U.S.C. § 2000e(b).  In turn, an "employee" is defined as "an individual employed by an employer." *Id.* § 2000e(f).

On the issue of whether a person is an "employee" within the meaning of Title VII in "the volunteer context", the case of *Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 219–221 (4th Cir. 1993), is instructive.  The case presented the question of whether a volunteer member of a fire fighting company in Maryland, who received no direct monetary compensation, was an employee covered under Title VII as well as the ADEA.  *Id.* at 220-221.  As a volunteer, the plaintiff did not receive a salary but did receive benefits pursuant to certain Maryland statutes, including a state-funded disability pension; survivors' benefits for dependents; scholarships for dependents upon disability or death; bestowal of a Maryland flag to the family upon death in the line of duty; benefits under the Federal Public Safety Officers' Benefits Act when on duty; group life insurance; tuition reimbursement; coverage under Maryland's Workers Compensation Act; tax-exemptions for unreimbursed travel expenses; ability to purchase, without paying extra fees, a special commemorative registration plate; and access to certification as a paramedic.  *Id.* at 221.

The district court held the benefits received by the plaintiff were insufficient to make her an employee.  *Id.*  On appeal, the Fourth Circuit reversed, concluding that the district court had made an impermissible finding of fact.  *Id.* at 221–22.  The *Haavistola* Court explained, *id.*:

> Because compensation is not defined by statute or case law, ... it cannot be defined as a matter of law. The district court must leave to a factfinder the ultimate conclusion whether the benefits represent indirect but significant remuneration as [the plaintiff] contends or inconsequential incidents of an otherwise gratuitous relationship as the [defendant] argues.

Thus, the Fourth Circuit determined that whether certain remuneration could convert a volunteer into an employee is a question of fact. *Id.*; *see Stewart v. Morgan State Univ.*, 46 F. Supp. 3d 590, 596 (D. Md. 2014) (denying summary judgment because the employment status of an intern based on the extent of compensation was an issue of fact, and evidence that plaintiff was not on state payroll and "did not receive monetary compensation" did not disqualify him from status of employee as a matter of law); *German v. Akal Sec., Inc.*, CCB-11-01242, 2011 WL 5974619, at *8 (D. Md. Nov. 29, 2011) (holding issue of whether security guard was an employee of government agency under Title VII was a question of fact).

A similar issue was addressed by Judge Titus in *Evans v. Wilkinson*, 609 F. Supp. 2d 489 (D. Md. 2009). He considered, on summary judgment, whether a volunteer paramedic and emergency medical technician of the Park Volunteer Rescue Squad was an employee. *Id.* at 492-497. In exchange for their services, volunteers of the Park Volunteer Rescue Squad received potential enrollment in: (1) a length of service program, which provided volunteers who had, among other things, completed at least 20 years of "certified active volunteer service," with monthly payments for life; (2) a first-time homeowner's assistance program, through which eligible volunteers were given up to $12,500 toward the purchase of their first home; and (3) a scholarship program, whereby Volunteer Rescue Squad volunteers who satisfied the length of service program requirements were eligible to apply for—but not guaranteed—a scholarship. *Id.* at 494-96.

Judge Titus found that *Haavistola* was factually distinguishable from *Evans*, based on the nature of benefits received by the plaintiff. *Id.* at 496–97. In evaluating whether these benefits transformed the plaintiff from a volunteer to an employee, Judge Titus noted that the plaintiff

was not paid a salary; she did not receive annual leave, medical benefits, or a retirement plan; and she was not covered by a workers' compensation insurance policy. *Id.* at 497. Moreover, Judge Titus found it significant that the benefits available were not guaranteed. *Id.* at 495. To receive the length of service monthly payments, for example, plaintiff would have to render at least twenty years of service to become eligible for the length of service benefits or the scholarship programs. *Id.* And, prior to the plaintiff's termination, she had only served four years. *Id.* at 490–91. Given that the benefits were predicated on such an "attenuated temporal nexus," *id.* at 495, Judge Titus concluded they did not constitute the sort of guaranteed remuneration contemplated by *Haavistola. Id.* at 496–97.

In contrast, in *Finkle v. Howard Cnty. Md.*, 12 F. Supp. 3d 780, 784-86 (D. Md. 2014), Judge Bredar ruled that a volunteer auxiliary police officer was an employee for purposes of Title VII. In *Finkle*, plaintiff received numerous "line-of duty" or "insurance-type" benefits. *Id.* at 785-86. In denying defendant's motion to dismiss, Judge Bredar said: "At first blush it may seem that a volunteer, i.e. one who does not receive wages or a salary, is not in an employment relationship." *Id.* at 784. However, he found indirect but significant remuneration sufficient to transform a volunteer to an employee. *Id.* at 786. The benefits at issue were consistent with the benefits received by the plaintiff in *Haavistola* and, according to Judge Bredar, constituted substantial enough remuneration to render the volunteer an employee under Title VII. *Id.* at 785-86.

In the course of his analysis, Judge Bredar conceded that courts in other circuits have held that "line-of duty benefits", *i.e.*, those that only apply upon death or disability in the line-of-duty, are not guaranteed forms of remuneration. *Id.* at 786 (citing *Holder v. Town of Bristol*, 09-

CV-32 PPS, 2009 WL 3004552, at *5 (N.D. Ind. Sept. 17, 2009); *Scott v. City of Minco*, 393 F.

Supp. 2d 1180, 1190 (W.D. Okla. 2005)).   Nonetheless, he explained that because of the Fourth

Circuit's decision in *Haavistola*, he could not find, "as a matter of law, that the 'significant

remuneration benefits available upon injury or death' Plaintiff would have received ... are

insufficient to bring her under the ambit of Title VII."   *Id.* at 786 (quoting *Haavistola*, 6 F.3d at

222).

According to Tyndall, BFC volunteers were eligible to receive twenty-seven distinct

forms of benefits/compensation as a result of their volunteer work.   Affidavit of Zackery C.

Tyndall, ECF 55-23 ("Tyndall Aff.") ¶ 4.   In an Affidavit submitted with his Opposition, Tyndall

listed those benefits as follows, *id*:

> (1) tuition reimbursement for courses in emergency medical and fire service techniques; (2) ability to purchase, at a reduced fee, a special commemorative registration plate for private vehicles; (3) affiliation with a fire company that allows the person to hold a certification as a paramedic; (4) $3,500 Length of Service Award Program tax credit each year; (5) free training materials; (6) free personal protective equipment; (7) state-funded disability pension; (8) retirement pension; (9) survivors' benefits for dependents; (10) state funded scholarships for dependents upon disability or death; (11) state flag to family upon death in the line of duty; (12) coverage under Maryland's worker's compensation; (13) mileage reimbursement; (14) tax-exemptions for unreimbursed travel expenses; (15) free health check-ups; (16) free flu shots and other immunizations; (17) lost wage reimbursement; (18) $40 per ambulance run; (19) free admission to BFC social events including six to eight dinners per year at local restaurants and the BFC banquet hall; (20) reimbursement for funeral expenses; (21) free stress management program; and (22) stipend for certain BFC leadership positions; (23) free Department of Transportation annual physical examination; (24) free BFC medical transportation and treatment for self and family members; (25) benchmark bonuses based on years of service; (26) free drug testing; and (27) discounts from local businesses for merchandise, services, and dining.

In a Supplemental Affidavit submitted with defendants' Reply, Fitzgerald agreed that

BFC provides eligible volunteers with some of the benefits Tyndall described.   *See* Fitzgerald

Supp. Aff., ECF 58-5.  Fitzgerald does not dispute that "affiliation with a fire company" such as

BFC "allows [a member] to hold a certification as a paramedic." *See* Tyndall Aff., ECF 55-23 ¶

4; Fitzgerald Supp. Aff., ECF 58-5.  Fitzgerald specifically agrees that the BFC "provided

reimbursement to volunteer members and/or directly pays for costs associated with advanced

medical service examinations (ALS), certification fees, registration fees, and training classes,"

ECF 58-5 ¶ 3; "provides volunteer members with personal protective equipment," *id.* ¶ 17;

"offer[s] Hepatitis B and TB testing to new volunteer members," *id.* ¶ 19; "arranges for an

occupational health van to come to the firehouse to perform annual physicals" on volunteers with

specialized skills and duties, *id.* ¶ 18; provides a $200 annual stipend to "The Fire Chief,

President, Secretary, EMS Treasurer and Fire Treasurer," *id.* ¶ 21; and has "an incentive program

for ambulance runs." *Id.* ¶ 22.

However, Fitzgerald characterizes some of these benefits as "nominal." *E.g.*, ECF 58-5

¶ 22.  With respect to the incentive program for ambulance runs, he included a series of tables in

his Supplemental Affidavit showing, for each year between 2008-2013, how many members

received awards, and the range of dollars awarded.  *Id.* at 4-6.  The total number of recipients

ranged from 24 to 27 across the period, and the awards ranged from "Less than $100" to "Over

$600."  *Id.*  Each year, approximately half of the recipients received "Less than $100," and

approximately half received between $100 and $600.  *Id.*  In 2010 and 2012, one person received

"Over $600"; in 2009, two received that much, and in 2008, three received that much.  *Id.*

Fitzgerald states that that "many of the BFC members who receive the incentive award

immediately donate the monies back to BFC."  ECF 58-5 ¶ 22.  With respect to the training

reimbursements, Fitzgerald asserts that, "[s]ince March 2004, BFC has paid less than $11,000 in such costs and/or reimbursements." *Id*. ¶ 3.

Further, Fitzgerald contends that the BFC provides some of the benefits Tyndall described, but at its own discretion. Specifically, BFC "may present a 'Berlin Fire Company flag'" to the family of a deceased member, but "this is an infrequent occurrence" and not required by the BFC Bylaws. ECF 58-5 ¶ 7. It "may arrange" for "free stress management programs" if "a volunteer states they [sic] need support after responding to a disturbing call." *Id*. ¶ 14. It "holds four (4) [annual] events in which [it] provides meals," and it "*may* provide meals to volunteer members during emergency calls, meetings or other training." *Id*. ¶ 15 (emphasis in original). And, although BFC "may later waive the insurance co-pay or deductible," BFC bills insurance companies for care provided to volunteer members or their families." *Id*. ¶ 20. Similarly, although "BFC does not solicit discounts from local businesses," "there are some local business owners who provide discounts to BFC members as well as other emergency service providers." *Id*. ¶ 24.

Fitzgerald also points out that some of the benefits Tyndall described are provided, but by other entities. Worcester County offers the "Length of Service Award Program" ("LOSAP") to which Tyndall referred. ECF 58-5 ¶ 6. Fitzgerald attached to his Supplemental Affidavit a copy of a document establishing and outlining the LOSAP. *See* ECF 58-5 ("LOSAP Plan"). The LOSAP Plan shows that each February participating "Fire and Ambulance" companies submit a list of volunteers who were "active" in the preceding year. *Id*. at 11-12. The County then makes a variable contribution "in an amount determined by the Trustees" of the Program to each eligible volunteer's account. *Id*. at 12. Once the volunteer reaches 25 years of service and 60

years of age, benefits "in an amount equal to the total of annual contributions made on behalf of the volunteer plus the investment earnings thereon as determined by the Trustees" are paid to the volunteer, via a payment plan selected by the member.  *Id*. at 13.  The LOSAP Plan also shows that the benefits may be paid out upon a member's disability or death, and there is a $3,000 death benefit.  *Id*.  The disability benefit appears limited to disability as a result of injury in the line of duty; the death benefits do not appear to be so qualified.  *Id*.  In addition, Worcester County provides BFC members with workers' compensation benefits.  Fitzgerald Supp. Aff. ¶ 16.  And, the State of Maryland provides the $3,500 tax credit described by Tyndall.  *Id*. ¶ 5.

Fitzgerald denies that any entity provides volunteers with the following: "reduced fees" for "commemorative" license plates, *id*. ¶ 4; "state-funded disability, or retirement pensions," or "survivors' benefits," other than what is provided by the LSOP, *id*. ¶ 6; "scholarships for dependents upon death or disability, *id* ¶ 8; "mileage reimbursement," *id*. ¶ 9, or tax credits for the same, *id*. ¶ 10; "free flu shots," *id*. ¶ 11; "lost wage reimbursement," *id*. ¶ 12; and "reimbursement for funeral expenses."  *Id*. ¶ 13.  Fitzgerald agrees that BFC provided reimbursement for firefighting training classes in the past, but asserts that BFC discontinued this benefit in December 2010. *Id*. ¶ 3.

Tyndall has shown there is a genuine dispute of material fact as to whether BFC volunteers received "significant remuneration," such that they would be considered "employees" under Title VII.  Certainly, Fitzgerald admits that BFC does provide some of the benefits that Tyndall described in his affidavit, apparently as a matter of course.  *See* ECF 58-5 ¶¶ 3, 17, 18, 19, 21, 22.  Fitzgerald asserts that a host of other benefits are provided, but are at BFC's discretion.  *Id*. ¶¶ 7, 14, 15, 20, 24.  And, Fitzgerald also agrees that certain additional benefits

are provided to BFC volunteers in exchange for their service, but points out they are provided by Worcester County or the State of Maryland, not by BFC.  *See* ECF 58-5 ¶¶ 5, 6, 12, 13, 16.

In defendants' Reply, they argue:  "In this case, the items provided by BFC …. are merely 'inconsequential incidents of an otherwise gratuitous relationship.'"  ECF 58 at 9 (quoting *Haavistola*, 6 F.3d at 222).  They contend that volunteers do not receive many of the benefits Tyndall described; that "even if such benefits were available, they were not provided for by BFC and similarly to *Evans*[, *supra*, 609 F. Supp. 2d 489], volunteer members would have to be qualified and selected to receive such benefits."  ECF 58 at 10.

However, defendants' arguments do not sufficiently distinguish this case from *Haavistola* or *Finkle* or align it with *Evans*.  First, in *Haavistola*, 6 F.3d at 221, the Fourth Circuit made clear that many of the benefits ultimately described as possibly amounting to "significant remuneration" were provided to the plaintiff "as a result of her membership with the Fire Company", not by the Fire Company itself.  It listed, for example, the "*state-funded* disability pension" and "tax-emptions for unreimbursed travel expenses" as relevant benefits, both of which are clearly provided by the State or local government.  *Id*. (emphasis added).  Second, defendants assert that "volunteer members would have to be qualified and selected to receive" many of the benefits Tyndall described.  ECF 58 at 10.  But, defendants do not explain which benefits are so conditioned, nor do they explain what conditions must be met to receive them.

Indeed, the benefits available to volunteer members of BFC appear to be very similar to those available to the plaintiff in *Haavistola*, who also volunteered with a fire company in Maryland.  It is undisputed that "affiliation with a fire company" such as BFC "allows [a member] to hold a certification as a paramedic," *see* Tyndall Aff., ECF 55-23 ¶ 4; Fitzgerald

- 42 -

Supp. Aff., ECF 58-5, and that BFC "provided reimbursement to volunteer members and/or directly pays for costs associated with advanced medical service examinations (ALS), certification fees, registration fees, and training classes," ECF 58-5 ¶ 3, and "provides volunteer members with personal protective equipment." *Id*. ¶ 17.  Further, it is undisputed that the State of Maryland provides volunteers with a $3,500 annual tax accredit, *id*. ¶ 5.  Worcester County provides workers' compensation benefits, *id*. ¶ 16, as well as death and disability benefits, *see* LOSAP Plan, 58-5 and, after twenty-five years of service, the County provides a monthly award payment.  *Id*.

Accordingly, there is a genuine dispute of material fact as to whether BFC members received "significant remuneration", such that at least four of them would be considered an "employee" within the meaning of Title VII, *Haavistola*, 6 F.3d at 222, and BFC would be considered an "employer" within the meaning of Title VIII.  42 U.S.C. § 2000e(b).  Thus, I must "leave to the factfinder the ultimate conclusion as to whether the benefits represent" such remuneration, as Tyndall claims, or only the "inconsequential incidents of an otherwise gratuitous relationship", as BFC argues.  *Haavistola*, 6 F.3d at 222; *see also Finkle*, 12 F. Supp. at 786; Fed. R. Civ. P. 56.

### 3.  Hostile Work Environment

As stated, Title VII prohibits an employer from, *inter alia*, discriminating against "any individual with respect to his compensation terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  *See Freeman*, *supra*, 750 F.3d at 420.

The statutory language makes clear that Title VII prohibits only certain kinds of employment actions, and only actions taken against an employee on a prohibited basis. *See* 42 U.S.C. §§ 2000-e2(a). First, "the existence of some adverse employment action is required." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Single acts that may not be cognizable as adverse actions on their own may, over time, cumulatively amount to an unlawful employment practice where they create a hostile work environment. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Hoyle*, 650 F.3d at 333-34. Second, the intentional discrimination must be on the basis of plaintiff's "race, color, religion, sex, or national origin." *See* 42 U.S.C. §§ 2000-e2(a)(1). But, "Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 329 (D. Md. 2003).

In this case, Tyndall claims that BFC supervisors discriminated against him by creating a hostile work environment, on the basis of sex, because he did not conform to their stereotype-based standards for male behavior. *E.g.*, Opposition, ECF 55 at 24. BFC disputes both the alleged basis for discrimination and the form. As a preliminary matter, BFC argues that some of the alleged conduct is time-barred. ECF 54-5 at 27. With respect to the discriminatory basis, BFC argues, first, that Tyndall's claim "must be dismissed as a matter of law" because the "instant lawsuit allege[s] hostile environment sexual harassment based on his perceived sexual

orientation", and Title VII does not prohibit discrimination on the basis of sexual orientation. ECF 54-5 at 30.  Second, it argues that the harassment alleged was not "based on sex".  ECF 54-5 at 30-39.  Rather, BFC maintains that the conduct was "based on [Tyndall's] perceived sexual orientation", and it was "nothing more than teasing/horseplay".  *Id.* at 30.  BFC also argues that "[t]he only arguably sexually harassing conduct"—a small subset of the allegations, according to BFC— "was not severe or pervasive" enough to constitute a hostile work environment.  *Id.* at 41. I will discuss each argument in turn.

### a. Conduct Occurring More Than 300 Days Before the EEOC Charge

BFC argues that some of the conduct Tyndall described in his complaint and relied on in his Opposition is not actionable because "all discrete acts of discrimination that occurred more than 300 days prior to the EEOC Charge of Discrimination are time-barred."  ECF 54-5 at 27.  In particular, BFC asserts that Tyndall's allegations that Trimble and Simpson touched Tyndall in the "groin and/or buttocks area in the 2007 or 2008 timeframe" are barred.  *Id.*  In response, Tyndall argues, *inter alia*, that "there are sufficient facts to support actionable claims for because-of-sex harassment, discrimination and retaliation claims which occurred between February 9, 2012 and March 12, 2013, and well within the limitations period."  ECF 55 at 20.

In *Nat'l R.R. Passenger Corp.*, *supra*, 536 U.S. at 122, the Supreme Court determined that "a charge alleging a hostile work environment claim", as here, "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."  Even assuming, *arguendo*, that Tyndall's allegations of inappropriate touching in the 2007-2008 time period are not "part of the same unlawful employment practice" as the hostile work environment claim alleged in Tyndall's

EEOC Charge and complaint, BFC has not argued that *all* of the acts pertaining to Tyndall's hostile work environment are time-barred.   Moreover, as discussed, *infra*, I agree with plaintiff that he has produced sufficient evidence to create genuine disputes as to whether BFC discriminated  against him on the basis of sex and as to whether he was subjected to a hostile work environment, even without taking into consideration the 2007-2008 allegations to which BFC objects.   Accordingly, I need not address this argument, because the point is moot.

### b.  Discrimination on the Basis of Sex

In the years since Title VII's enactment, the Supreme Court has made clear that discrimination on the basis of sex may be manifest in a variety of ways.   An employer discriminates on the basis of sex, for example, when it has different hiring criteria for men and women that are not related to a bona fide occupation qualification.   *See   Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (per curiam) ("The Court of Appeals therefore erred in reading [Title VII] as permitting one hiring policy for women and another for men—each having pre-school-age children.").   Sexual harassment, *e.g.*, "'[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature'", may also constitute sex-based discrimination.   *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (quoting 29 CFR § 1604.11(a) (1985)).   This is true regardless of whether the harasser(s) and victim are of the opposite or same sex.   *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998) ("[S]ex discrimination consisting of same-sex sexual harassment is actionable under Title VII … .").[10]

---

[10] Courts have also recognized a subset of sexual harassment claims knowns as "*quid pro quo*" claims, where "sexual consideration is demanded in exchange for job benefits." *Rachel-Smith v. FTData, Inc.*, 247 F. Supp. 2d 734, 745 (D. Md. 2003); *see also McWilliams v. Fairfax*

Of relevance here, the Supreme Court has also found that employers discriminate on the basis of sex when they make employment decisions based "on mere 'stereotyped' impressions about the characteristics of males or females." *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 (1978).  For example, in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 237, 251 (1989), *superseded in part by* Civil Rights Act of 1991, Tit. I, § 107(a), 105 Stat. 1075, the Court affirmed that "Price Waterhouse … unlawfully discriminated against Hopkins on the basis of sex by giving credence and effect to partners' comments that resulted from sex stereotyping."  Specifically, "[o]ne partner described [Hopkins, a female] as 'macho'; another suggested that she 'overcompensated for being a woman'; a third advised her to 'take a course at charm school'".  *Id.* at 235 (citations omitted, alterations added).  Hopkins was also advised that, "in order to improve her chances for partnership," she should "'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.'"  *Id.* at 235 (quoting district court opinion).  As a result of these impressions, Price Waterhouse declined to make Hopkins a partner of the firm and to reconsider her candidacy at a later date. *Id.* at 232.  The Court concluded that such "sex stereotyping" could support a claim for sex-based discrimination, stating:  "[W]e are beyond the day when an employer could evaluate employees

---

*Cnty. Bd. of Supervisors*, 72 F.3d 1191, 1195 (4th Cir. 1996), *abrogated on other grounds by Oncale*, *supra*, 523 U.S. 75.  In its Memo, BFC recognizes that "Tyndall has only alleged a hostile or abusive environment claim".  ECF 54-5 at 28.  Nonetheless, it argues:  "To the extent that Tyndall may attempt to claim *quid pro quo* sexual harassment … Tyndall has failed to allege this claim in his EEOC Charge and is, therefore, barred from making a claim herein."  *Id.*  In his Opposition, Tyndall did not address this argument.  *See generally* ECF 55.  In any event, because, as BFC acknowledges, Tyndall is not advancing a "*quid pro quo*" claim or theory, I need not address this argument.

by assuming or insisting that they matched the stereotype associated with their group … ." *Id.* at 251.

Of course, "'just as a woman can ground an action on a claim that men discriminated against her because she did not meet stereotyped expectations of femininity, a man can ground a claim on evidence that other men discriminated against him because he did not meet stereotyped expectations of masculinity.'" *Simonton v. Runyon*, 232 F.3d 33, 37 (2d Cir. 2000) (quoting *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 n.4 (1st Cir. 1999)); *see also, e.g.*, *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 456 (5th Cir. 2013) (en banc); *Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1135 (10th Cir. 2005); *Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 870 (9th Cir. 2001); *Centola v. Potter*, 183 F. Supp. 2d 403, 410 (D. Mass. 2002) ("Although [plaintiff] never disclosed his sexual orientation to anyone at work, if [plaintiff]'s co-workers leapt to the conclusion that [the plaintiff] 'must' be gay because they found him to be effeminate, Title VII's protections should not disappear."). Indeed, courts have held that conduct like that alleged here was discrimination on the basis of sex because it conveyed that the plaintiff's behavior did not conform to the harasser's sex-based stereotypes.

In *Boh Brothers Construction Co.*, *supra*, 731 F.3d at 456, the en banc Fifth Circuit upheld a jury verdict on the following facts, among others, *id.* at 449-50:

> The worksite was an undeniably vulgar place. Wolfe [(plaintiff's supervisor)] and the crew regularly used "very foul language" and "locker room talk." According to other crew members, Wolfe was a primary offender: he was "rough" and "mouthy" with his co-workers and often teased and "ribbed on" them.
> By April 2006, Woods had become a specific and frequent target of Wolfe's abuse. Wolfe referred to Woods as "pu—y," "princess," and "fa—ot," often "two to three times a day." About two to three times per week—while Woods was bent over to perform a task—Wolfe approached him from behind and simulated anal intercourse with him. Woods felt "embarrassed and humiliated" by

the name-calling and began to look over his shoulder before bending down.  In addition, Wolfe exposed his penis to Woods about ten times while urinating, sometimes waving at Woods and smiling.

One time, Wolfe approached Woods while Woods was napping in his locked car during a break. According to Woods, Wolfe "looked like he was zipping his pants" and said, "[i]f your door wouldn't have been locked, my d-ck probably would have been in your mouth."

According to Wolfe, some of his teasing originated from Woods's use of Wet Ones instead of toilet paper, which Wolfe viewed as "kind of gay" and "feminine." …

The Fifth Circuit concluded that a reasonable juror could find that Woods suffered discrimination "because of his sex" because "Woods fell outside of Wolfe's manly-man stereotypes." *Id.* 459-60.

Similarly, in *Nichols*, *supra*, 256 F.3d at 870, a male plaintiff, Antonio Sanchez, established the following conduct at trial:

Throughout his tenure at Azteca, Sanchez was subjected to a relentless campaign of insults, name-calling, and vulgarities.  Male co-workers and a supervisor repeatedly referred to Sanchez in Spanish and English as "she" and "her."  Male co-workers mocked Sanchez for walking and carrying his serving tray "like a woman," and taunted him in Spanish and English as, among other things, a "faggot" and a "fucking female whore." The remarks were not stray or isolated. Rather, the abuse occurred at least once a week and often several times a day.

The defendant argued that the alleged harassment was not "based on sex".  *Id.* at 871.

However, the Ninth Circuit determined that it was "based on sex", citing *Price Waterhouse*, and stated, *id.* at 874-75:

At its essence, the systematic abuse directed at Sanchez reflected a belief that Sanchez did not act as a man should act.  Sanchez was attacked for walking and carrying his tray "like a woman"—i.e., for having feminine mannerisms. Sanchez was derided for not having sexual intercourse with a waitress who was his friend.  Sanchez's male co-workers and one of his supervisors repeatedly reminded Sanchez that he did not conform to their gender-based stereotypes,

referring to him as "she" and "her."  And, the most vulgar name-calling directed
at Sanchez was cast in female terms.  We conclude that this verbal abuse was
closely linked to gender.

*Price Waterhouse* sets a rule that bars discrimination on the basis of sex
stereotypes.  That rule squarely applies to preclude the harassment here.

To be sure, allegations that a plaintiff's co-workers routinely called a plaintiff "gay" or

"faggot" or other words related to sexuality do not necessarily establish a claim for

discrimination "based on sex."  In *Oncale*, *supra*, 523 U.S. at 80, the Supreme Court reiterated:

"We have never held that workplace harassment, even harassment between men and women, is

automatically discrimination because of sex merely because the words used have sexual content

or connotations."

The case of *Hamm v. Weyauwega Milk Products, Inc.*, 332 F.3d 1058 (7th Cir. 2003),

cited by BFC in its Memo, ECF 54-5 at 32, is illustrative.  In *Hamm*, the male plaintiff, Hamm,

alleged, *inter alia*, that one of his co-workers "constantly" referred to him and another co-worker

as "faggots," and sometimes referred to him as "girl scout".  *Id*. at 1063-64.  Hamm argued that

his "coworkers did not believe he fit the sexual stereotype of a man, and that their sexual

stereotyping is evidence of discrimination 'because of' sex."  *Id*. at 1062.  Nonetheless, the

district court granted summary judgement for defendant, and the Seventh Circuit affirmed.  *Id.* at

1065.  The Seventh Circuit reasoned, in short, that there was no basis to infer discrimination

based on sex because the alleged harassers used sex-tinged language "indiscriminately".  *Id.* at

1063-64.  The court stated, *inter alia*, *id.* (emphasis added):

In addition to assessing the way in which his coworkers' statements were
experienced by Hamm, *see Oncale,* 523 U.S. at 81, 118 S.Ct. 998, we also must
consider, as in any sex harassment case, the "social context in which the particular
behavior occurs."  *Id.*  Here it is difficult to separate many of Hamm's complaints
from the significant amount of horseplay that occurred at the Weyauwega plant.

… Hamm admits that even his alleged harassers were the victims of workplace pranks. For example, in his deposition, Hamm described an incident directed at Bohringer in which one of the workers wrote "Dean plus [male name]" all over a door. …

Even Hamm's claim that Bohringer referred to him as "girl scout," the strongest factual allegation he makes that his coworkers' actions were linked to his nonconformance to sex stereotypes, does not establish that he was discriminated against because of his sex. In his deposition, *Bohringer alleged that he referred to his colleagues with this term indiscriminately, and one of Weyauwega's managers, Dan Stearns, testified that Bohringer had even used the term to refer to him.* Hamm acknowledges that Bohringer called other men at the plant "girl scouts," but he calls this fact "immaterial." Bohringer's use of the term to refer to other men, including a supervisor, is hardly immaterial; *Hamm cannot point to its use as persuasive evidence that he was treated differently because of his sex when other men at the plant were referred to by the same name.* Because there is nothing to suggest that Bohringer viewed the other men at the plant as nonconforming to sexual stereotypes, his use of the term to describe Hamm cannot support an inference of sex discrimination.

*Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 465 (6th Cir. 2012), also cited by BFC

in its Memo, ECF 54-5 at 32, is informative as well. There, the male plaintiff, Wasek,

established the following facts, *id.*:

On the [oil] rig, Ottobre [(a male)] began touching Wasek in a sexual manner: grabbing his buttocks, poking him in the rear with a hammer handle, and poking him in the rear with a long sucker rod. On each occasion, Wasek reacted by cursing and demanding that he not be touched. Ottobre further inflamed the situation with comments such as "you've got a pretty mouth," "boy you have pretty lips," and "you know you like it sweetheart." Ottobre did not relent: he told sexually explicit jokes, stories, fantasies, and called Wasek names. Wasek believed that Ottobre acted like this because [Ottobre] was bisexual.

Apparently, Wasek did not argue that Ottobre's comments reflected Ottobre's belief that

Wasek was effeminate or that Wasek did not conform to sex stereotypes. *Id*. Rather, Wasek

believed that Ottobre was coming on to him. Ultimately, the Sixth Circuit upheld the district

court's grant of summary judgment for the defendant; the court agreed that there was no credible

evidence Ottobre actually was bisexual, thus preventing Wasek from proceeding to a jury on a theory of sexual harassment. *Id.* at 468.

Here, Tyndall's claim resembles more closely the claims in *Boh Brothers* and *Nichols* than the claims in *Hamm* and *Wasek*. For example, Simpson stated that he believed the practice of calling  Tyndall "Gay Boy" had its origins in Tyndall's refusal, in high school, to have sex with an intoxicated girl. *See* Simpson Depo. Pt. One, at 69:21, 70, 1-16.  Tyndall stated that he interpreted this to mean that BFC members who called him that name "thought that I should have had sex with her". Tyndall Depo. Pt. One, ECF 54-12 at 65:12-17.  At the time, Tyndall "didn't really think much of it". *Id.*  In time, however, the name-calling intensified and, by 2011 and 2012, the comments spread to include specific, personal criticism of Tyndall's hair, clothing, diet, vehicle, home décor, the "way [he] carried [him]self in general", and even his relationship with his mother.  Tyndall Depo. Pt. Two, ECF 55-6 at 207:12-19.  Moreover, unlike *Hamm* and *Wasek*, Tyndall produced evidence that he was treated differently than other BFC members.  For example, Trimble agreed that he did not call any of the other male paramedics "gay, gay boy, faggot, fag, homo, [or] queer".  *See* Tyndall Depo. Pt. Two, ECF 55-8 at 130:17 through 132:1.  Nor did Trimble "make fun of" the vehicles driven by other members.  *Id.*  Thus, it is undisputed that many of the comments relied on sex stereotypes, criticized Tyndall's particular habits and characteristics, and were directed only at Tyndall.

In light of all this, a reasonable juror could conclude that the comments of Tyndall's co-workers conveyed beliefs that Tyndall did not conform to stereotypical notions of how males should behave.  *See Boh Bros. Const. Co.*, 731 F.3d at 456; *Nichols*, *supra*, 256 F.3d at 870; *Centola*, 183 F. Supp. 2d at 410; *see also Heller v. Columbia Edgewater Country Club*, 195 F.

Supp. 2d 1212, 1217 (D. Or. 2002).  Consequently, there is a genuine dispute of material fact as to whether BFC discriminated against Tyndall on the basis of sex.

### c.  Severe or Pervasive Discriminatory Behavior

As stated, Tyndall alleges that BFC discriminated against him by subjecting him to a hostile work environment. "A hostile environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Boyer-Liberto v. Fontainbleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (quoting *Harris*, *supra*, 510 U.S. at 21 (alterations in *Boyer-Liberto*)).  Thus, to show that a hostile work environment was created on the basis of sex discrimination, plaintiff must establish "that the offending conduct (1) was unwelcome, (2) was based on … sex, (3) was sufficiently severe or pervasive to alter the conditions of … employment and create an abusive work environment, and (4) was imputable to [the] employer." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc), *cert. denied*, 540 U.S. 1177 (2004).

As to element three at issue here, the en banc Fourth Circuit recently said, *Boyer-Liberto*, 786 F.3d at 277:

> Element three of a hostile work environment claim requires a showing that "the environment would reasonably be perceived, and is perceived, as hostile or abusive"; the plaintiff may, but is not required to, establish that the environment is "psychologically injurious." *See Harris*, 510 U.S. at 22.   Whether the environment is objectively hostile or abusive is "judged from the perspective of a reasonable person in the plaintiff's position." *Oncale* [, *supra*, 523 U.S. at 81.] That determination is made "by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367. It "is not, and by its nature cannot be, a mathematically precise test." *Id.* at 22.

*See also*, *e.g*, *Pryor v. United Airlines, Inc.*, ___ F.3d ___, 2015 WL 3973562, at *6 (4th Cir. July 1, 2015); *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998).

The Court also reiterated in *Boyer-Liberto*, 786 F.3d at 278 (citation omitted): "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *See also*, *e.g.*, *E.E.O.C. v. Fairbrook Medical Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) (quoting *Ziskie v. Mineta*, 547 F.3d 220, 227 (4th Cir. 2008)) ("When evaluating the context in which harassment takes place, we have often focused on the 'disparity in power between the harasser and the victim.'"); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 697 (4th Cir. 2007) (en banc) ("Any age disparity between the harasser and his victim is also relevant to gauging whether there was a hostile or abusive sexual environment.").

BFC argues that, in context, the conduct alleged was mere "'ordinary socializing in the workplace—such as male on male horseplay or intersexual flirtation.'" ECF 54-5 at 39 (quoting *Oncale*, 523 U.S. at 81). To be sure, BFC produced evidence that some level of "male on male horseplay" was commonplace in the firehouse, and that Tyndall engaged in such "horseplay". Simpson stated, for example, that Tyndall called another co-worker, Glenn Baublitz, "gay and faggot" "all the time", Simpson Depo. Pt. One, 86:3-8, and Trimble stated that Tyndall "goosed" Baublitz, *i.e.*, "smack[ed]" his butt. Trimble Depo. Pt. One, ECF 54-9 at 92:2-7. Donohoe also testified that Tyndall once grabbed Donohoe's "butt" and "breasts". Donohoe Depo Pt. One, ECF 54-11 at 55-58. According to defendants, Tyndall made scattered comments about engaging in sexual activity with the wives of Trimble and Donohoe, *id.* at 82:16-18, 83:1-20, Trimble Depo. Pt. One, ECF 54-9 at 94:18-21, 95:1-15, and about another BFC member

"'lik[ing] it up the ass'".  Simpson Depo. Pt. One, 84:11-21, 85:1-21.  Tyndall also allegedly played into his "gay boy" nickname by calling himself the "Rainbow Coalition" "a few times" and by answering his phone by stating "Homo Anonymous" "lots of times".  *Id.* at 84:4-10, 79:10-15.  In addition, Trimble noted that Tyndall made fun of his weight and hair loss.  Trimble Depo. Pt. One, ECF 54-9 at 84:18-21, 85:1-3.

Viewing the facts in the light most favorable to the non-movant, as I must, it appears that Tyndall engaged in horseplay at the firehouse, but it was much less frequent; not as nasty as that of the defendants; and it was in response to or prompted by defendants' conduct.  Donohoe averred that Tyndall grabbed Donohoe's "butt" and "breasts" twice in one evening, for example, but he further stated that Tyndall stopped when Donohoe asked him to stop, and Tyndall apparently never did it again.  Donohoe Depo Pt. One, ECF 54-11 at 55-59.  In contrast, Tyndall stated that, although he repeatedly asked Donohoe not to call him "Gay Boy" or similar names, Donohoe used such language frequently, "up until the point [Donohoe] was fired", and, as a result, Tyndall felt that he "no longer had a name."  Tyndall Depo. Pt. Two, ECF 55-6 at 95:20-22, 96:1-13.  Further, Tyndall stated that Trimble and Simpson would "constantly make comments" that were disparaging about Tyndall's hair, clothing, diet, etc.  Tyndall  Depo. Pt. Two, ECF 55-6 at 207:12-19.  Trimble and Simpson did not dispute this.  *See*, *e.g.*, ECF 54-5 at 33-35, 41-42.  In contrast, Trimble and Simpson described about a dozen instances of Tyndall making ostensibly inappropriate comments during the four-year period of his employment with BFC.  *See supra* at 21-23.

BFC's argument is much like the one advanced by the defendants in *E.E.O.C. v. Fairbrook Medical Clinic, P.A.*, *supra*, 609 F.3d at 328, which the Fourth Circuit described as follows:

> Fairbrook's principal argument is that Kessel's ([the alleged harasser)] conduct, when viewed in its social context, was not severe; instead, it was merely the sort of crude behavior that is not actionable under Title VII. Specifically, it points out that the conduct occurred in a medical clinic where employees dealt with human bodies every day. In this environment, it was not uncommon for both patients and employees to tell off-color jokes to ease the tensions in otherwise awkward situations. The casual nature of this environment, Fairbrook contends, is best illustrated by the fact that Waechter herself considered it appropriate to display pictures of shirtless men in her examination room.

The district court granted summary judgment for defendant on finding that the conduct alleged "was not sufficiently severe or pervasive". *Id*. at 324. But, the Fourth Circuit reversed, concluding that a "jury could find that a reasonable person in [plaintiff's] position might tolerate run-of-the-mill jokes and even make some herself while still finding [her supervisor's] unique brand of invective to be hostile or abusive." *Id.* at 329. The Court emphasized that, although crude jokes may have been common in the workplace, the plaintiff's "allegations, if proven, show[ed] that Kessel targeted her with highly personalized comments designed to demean and humiliate her." *Id*. at 328-29. It added that "the environment at the clinic actually enhanced the severity of the harassment rather than negating it", because Kessel "had significant authority over [the plaintiff] on a day-to-day basis and the ability to influence the rest of her career." *Id.* at 329.

Similarly, in this case, a reasonable juror could conclude that the abuse Tyndall suffered at the firehouse, if proven, was severe and pervasive enough to create a hostile work environment. In effect, Trimble, Simpson, and Donohoe—all of whom had some supervisory

authority over Tyndall—changed the conditions of Tyndall's employment by insisting he behave like the manly men they believe themselves to be, and punishing his non-conformity with a barrage of "nicknames" and comments they knew to be offensive and unwelcome.  The severity of this conduct is heightened by the disparities in age and power between the harassers and Tyndall.  Like the supervisor in *Fairbrook Medical Clinic*, Trimble held power not only over Tyndall's day-to-day experience at the firehouse, but also over Tyndall's career trajectory, in light of the facts that Tyndall was only just beginning his career and Trimble is a well-established leader in the local field.

Accordingly, there is a genuine dispute of material fact as to whether the conduct alleged was sufficiently severe or pervasive to constitute a hostile work environment.  *See Fairbrook Medical Clinic, P.A.*, 609 F.3d at 328-29; *see also*, *Boh Bros. Const. Co.*, 731 F.3d at 456; *Nichols*, 256 F.3d at 870; *Centola*, 183 F. Supp. 2d at 410; *Heller*, 195 F. Supp. 2d at 1217.

### B.  Intentional Infliction of Emotional Distress

Generally speaking, claims for intentional infliction of emotional distress are disfavored and difficult to establish and, as such, are "rarely viable."  *Respess v. Travelers Cas. & Sur. Co. of Am.,* 770 F. Supp. 2d 751, 757 (D. Md. 2011).  In order to prevail on a claim for IIED in Maryland, plaintiffs must show that (1) the defendants' conduct was intentional or reckless; (2) their conduct was extreme and outrageous; (3) there was a causal connection between the defendants' wrongful conduct and the emotional distress suffered; and (4) the emotional distress was severe.  *Harris v. Jones,* 281 Md. 560, 566 380 A.2d 611, 614 (1977); *accord, e.g.*, *Manikhi v. Mass Transit Admin.,* 360 Md. 333, 758 A.2d 95, 112, 113 (2000); *Mixter v. Farmer,* 215 Md.

App. 536, 548, 81 A.3d 631, 637 (2013); *Lasater v. Guttmann,* 194 Md. App. 431, 448, 5 A.3d 79, 89 (2010).

Trimble and Simpson argue, *inter alia*, that Tyndall has failed to show they engaged in conduct sufficiently "extreme and outrageous" to establish a *prima facie* claim for IIED.  ECF 54-5 at 42-45.  Defendants emphasize that "there is sufficient evidence to show that Tyndall was an active participant in firehouse banter and participated in the very types of actions of which he now complains", *i.e.*, enough to counter any possibility that defendants' conduct could be regarded as "extreme and outrageous".  *Id*. at 45.

In response, Tyndall argues that this case is distinguished by "the duration, frequency, intensity, and hostility of the acts and [the] nature of the workplace and [the] relationship of the parties involved."  ECF 55 at 28.  He asserts that the alleged discrimination "began when [he] was a cadet and continued until the very day he was fired", and that it "intensified significantly in response to his complaints to BFC officials and even further after he complained" to the Town.  *Id*.  Moreover, Tyndall contends that the nature of his work and his relationship with Trimble and Simpson made the tension especially distressing.  He states, *id*. at 28-29:

> [F]irefighters and EMTs by their very nature and job duties are involved in acts which generally require two, three, or more people for successful completion.  If it is a fire it could be dozens.  Each person must be able to rely upon the other to act spontaneously and appropriately not only to save the person or property involved, but also to protect or save their fellow firefighter if the need arises.  This bond between firefighters of unquestioned loyalty gives each a sense of security without which their levels of stress and anxiety would surely rise.  In this case, the BFC officials and some of the individual firefighters made it quite clear that that bond of loyalty no longer extended to [Tyndall].  It is against this background of prolonged hostility and ultimate ostracization that the conduct of Defendants should be measured.

The "extreme and outrageous" standard is quite high.  *See generally Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514, 665 A.2d 297, 319 (1995) (the tort of intentional infliction of emotional distress is "rigorous, and difficult to satisfy"), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996).  The defendant's conduct must be "'so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'"  *Arsham v. Mayor & City Council of Baltimore*, ___ F. Supp. 3d ___, JKB-14-2158, 2015 WL 590490, at *8-9 (D. Md. Feb. 11, 2015) (quoting *Harris*, 281 Md. at 567, 380 A.2d at 614).  Indeed, "[t]o be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'"  *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 248 (D. Md. 1997) (quoting *Hamilton v. Ford Motor Credit Co.,* 66 Md. App. 46, 59–60, 502 A.2d 1057, 1064, *cert. denied*, 306 Md. 118, 507 A.2d 631 (1986)), *aff'd*, 166 F.3d 1208 (4th Cir. 1998).

In *Brengle v. Greenbelt Homes, Inc.*, 804 F. Supp. 2d 447, 453 (D. Md. 2011), then Chief Judge Chasanow outlined common considerations as to whether conduct is "extreme and outrageous":

> In evaluating whether the identified conduct is extreme and outrageous, courts should consider multiple factors, including the context in which the conduct occurred, the personality of the plaintiff and her susceptibility to emotional distress, and the relationship between the defendant and plaintiff.  *See, e.g., Moniodis v. Cook,* 64 Md.App. 1, 17, 494 A.2d 212, *cert. denied*, 304 Md. 631, 500 A.2d 649 (1985); *Figueiredo-Torres,* 321 Md. at 654, 584 A.2d 69.  "[T]he extreme and outrageous character of the defendant's conduct may arise from his abuse of a position, or relation with another person, which gives him actual or apparent authority over him, or power to affect his interests."  [*Harris,*] 281 Md. at 569, 380 A.2d 611 (citing Restatement (Second) of Torts § 46 comment e (1965)).  Furthermore, "[i]n cases where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress, his conduct will be carefully scrutinized by the courts."  *Id.* at 569, 380 A.2d 611 (citing 1 F. Harper & F. James, Jr., The Law of Torts § 9.1 at 666–67 (1956); W. Prosser, Handbook

of the Law of Torts § 12 at 56 (4th ed. 1971)); *see also Figueiredo-Torres*, 321 Md. at 654, 584 A.2d 69 (recognizing that a psychologist is in a unique position to influence a patient's emotional well-being and their conduct must be closely scrutinized); *Kentucky Fried Chicken Nat'l Mgmt. Co.* [*v. Weathersby*,] 326 Md. 663, 677, 607 A.2d 8 (1992) (recognizing that the employer/employee relationship may be significant factor in determining whether there is liability for tort of IIED). Where reasonable jurors may differ as to whether the defendant's conduct may be regarded as extreme and outrageous, the question should be submitted to a jury. *Harris,* 281 Md. at 569, 380 A.2d 611; *Jackson v. Kimel*, 992 F.2d 1318, 1324-25 (4th Cir. 1993).

To be sure, other judges in this District have repeatedly stated: "As inappropriate and repulsive as workplace harassment is, such execrable behavior almost never rises to the level of outrageousness, and almost never results in such severely debilitating emotional trauma, as to reach the high threshold invariably applicable to a claim of intentional infliction of emotional distress under Maryland law." *Arbabi v. Fred Meyers, Inc.*, 205 F. Supp. 2d 462, 466 (D. Md. 2002) (dismissing IIED claim where plaintiff alleged she "was continually subjected to derogatory remarks based upon her sex as a female, her religion as a Muslim, and her national origin as an Iranian"); *accord, e.g., Wimbush v. Kaiser Found. Health Plan of the Mid Atl. States, Inc.*, TDC-14-00525, 2015 WL 2090654, at *9 (D. Md. May 4, 2015) (dismissing IIED claim where plaintiff alleged employer denied her FMLA leave, ignored "other requests for time off, gave better shifts, more clerical assistance, and more feedback to white employees, shut the door on [plaintiff], took personal credit for [plaintiff's] work, and eventually fired her"); *Murphy v. Republic Nat. Distrib. Co., LLC.*, JFM-13-02758, 2014 WL 4406880, at *7 (D. Md. Sept. 5, 2014) (dismissing IIED claim where plaintiff alleged he was "routinely subjected to derogatory comments about his age"); *Lauture v. St. Agnes Hosp.*, CCB-08-00943, 2009 WL 5166253, at *12 (D. Md. Dec. 29, 2009) (dismissing IIED claim based on employer directing security to escort employee out of the building), *aff'd*, 429 F. App'x 300 (4th Cir. 2011).

As the Maryland Court of Appeals in *Weathersby*, 326 Md. at 678-79, 607 A.2d at 15 (citation omitted), "an employer must be given a certain amount of latitude in dealing with employees."  In this case, however, Tyndall has produced evidence of conduct significantly more extreme and outrageous than in *Arabi*, *Wimbush*, *Murphy*, and *Lauture*.  Indeed, the allegations, if proven, are more extreme and outrageous than most other cases that have come before this District.  *See, e.g.*, *Nesbitt v. Univ. of Md. Med. Sys.*, WDQ-13-00125, 2013 WL 6490275, at *9 (D. Md. Dec. 6, 2013) (citation and footnote omitted) ("Nesbitt alleges that Venuto yelled at her, ignored her, belittled her, and accused her of looking at his butt.  Although these actions allegedly caused Nesbitt distress, and created a disagreeable work environment, they do not come close to establishing the requisite extreme and outrageous conduct required to state an IIED claim."); *Colfield v. Safeway Inc.*, WDQ-12-03544, 2013 WL 5308278, at *9 (D. Md. Sept. 19, 2013) ("Colfield has not stated a claim for IIED. He has alleged that Safeway unjustly terminated him for 'alleged workplace violence,' suspended him for extended periods of time without pay, and fabricated a story that he assaulted a co-worker."); *Cartwright v. Howard Hughes Med. Inst.*, PJM-12-01978, 2013 WL 423762, at *3 (D. Md. Feb. 1, 2013) ("Zimmerman's supposed interactions with Cartwright were limited to shouting and curtness … ."); *Cuffee v. Verizon Communications, Inc.*, 755 F. Supp. 2d 672, 680 (D. Md. 2010) (dismissing IIED claim where plaintiff alleged that one supervisor "subjected" her to "sexual advances" for five months, another impregnated her then cut off contact, and company transferred and demoted her).

To recount, as discussed above, Tyndall has produced evidence that Trimble and Simpson—men almost twice his age, and in supervisory positions—subjected him to a

prolonged, continuous barrage of derogatory remarks, to which Tyndall repeatedly objected. Defendants' conduct occurred in two workplaces—at BFC, and in Ocean City—and spanned multiple years. And, as Tyndall argued in Opposition, the kind of trust and teamwork required in this field must be taken into account; intentional provocation and ostracism in a workplace where colleagues depend on one another for their lives and to save the lives of others is more outrageous than the same conduct in, say, a retail environment. *See* ECF 55 at 28-29; 2012 Eval., ECF 55-28 at 5 ("4/19/12: Fireman Tyndall reported anxiety riding in the fire truck associated with the thought that if his life were in jeopardy, 'co-workers' would not save it (his life).").

Moreover, the conduct spilled beyond Tyndall's workplace:  Tyndall claims, for example, that Trimble sometimes followed Tyndall's former girlfriend around town, insisting to her that Tyndall is gay, Tyndall Depo. Pt. Two, ECF 55-6 at 269:11-22, 270:1-11; that Trimble and Simpson "hollered" aloud to at least one other girl Tyndall was dating that they believe Tyndall is gay when defendants saw the couple "through town", *id.* at 380:13-22; and that Trimble urged Tyndall's mother, in front of a large group, to just "admit" that Tyndall is gay. *Id.* at 379-80.

Additionally, as discussed above, the conduct continued even after Tyndall reported his concerns to BFC Board Members, and after Tyndall reported his concerns to the officials of Berlin.  Indeed, it appears that the more Tyndall sought to stop defendants' intentionally demeaning behavior, the worse it got.

Considering the facts in the light most favorable to the non-movant, a reasonable juror could find that such conduct was deliberate, intentional, and outrageous.  And, in light of its continuous nature over the course of multiple years and environments, a reasonable juror could

determine that it was extreme, beyond any typical workplace offenses or indiscretions, and "'utterly intolerable in a civilized community.'" *See Arsham*, 2015 WL 590490, at *9 (quoting *Harris*, 281 Md. at 567, 380 A.2d at 614) (denying defendant's motion to dismiss IIED claim where plaintiff alleged her supervisor's discriminatory treatment, including disciplining her every time she needed time off, putting her subordinate in charge of reviewing her requests and her work, assigning security guards to be present when she attended public events, and withholding information she needed to do her job, continued after plaintiff's psychiatrist informed her employer of the stress it caused her).

In my view, Tyndall has shown there is a genuine dispute of material fact as to whether the conduct of Trimble and Simpson was so extreme and outrageous as to support a claim for IIED.  To be sure, Tyndall may not succeed in his claim.  But, it is not the province of the court to make factual findings or to resolve factual disputes.

### Conclusion

For the foregoing reasons, I will deny the Motion (ECF 54).  A separate Order follows, consistent with this Memorandum Opinion.


Date: July 16, 2015                    _____/s/_____
                                       Ellen Lipton Hollander
                                       United States District Judge